*672 OPINION OF THE COURT
Carolyn E. Demarest, J.
Plaintiff Porfirio Cortes commenced the instant action by filing his complaint on June 13, 2011, based upon his undisputed ownership of 16.67% of the shares of the corporate defendant, for which he paid $50,000 in 2003. Pursuant to a written agreement dated August 9, 2003, executed by Cortes and defendant Angelo Ramunni, if purchaser Cortes decided to sell his shares or resign his position as “managing partner” of the corporation, seller had the option of first refusal to purchase the shares “unless said resignation is caused by the demand of the seller and its principals for the Purchaser to engage in employment in an entity owned and operated by said Seller and principals” (agreement).[1] A handwritten addendum to the typewritten agreement, which is separately executed by Cortes and Ramunni, further provides: “Purchasers [sic] position with the corporation is a managing partner. In the event Mr. Cortes decides to resign his position as manager Sellers have the right to purchase back his shares and terminate the partnership.” The business of the corporation is the operation of a Mexican restaurant known as Cabo, located in Rockville Centre, New York (Cabo).
Plaintiff complains that the individual defendants, each of whom owns 41.7% of the corporation, have breached their fiduciary duty to him and the corporation by siphoning off profits of the corporation, failing to hold shareholder meetings, failing to purchase his shares at fair value, and, against all defendants, for failure to declare a dividend in which he would receive his fair share of the profits in proportion to his ownership interest. Plaintiff seeks dissolution of the corporation on a common-law theory of fraudulent and oppressive conduct toward him and, derivatively on behalf of the corporation, the imposition of a constructive trust over the money, property and assets of Ramunni and Dominick DeSimone to secure the recovery of any judgment against them. The complaint originally pleaded 10 causes of action, including, pursuant to Business Corporation Law § 624, for inspection of books and records and financial statements (the first and second causes of action), and an equitable accounting (the fourth and ninth causes of action) which *673 were dismissed, without opposition, upon defendants’ motion for summary judgment, by order dated June 28, 2013.[2] The remaining claims include: an individual claim against the individual defendants for breach of fiduciary duty, for which plaintiff sought punitive damages (third cause of action); failure to declare a dividend (fifth cause of action); a demand that the individual defendants purchase plaintiffs shares at fair value (sixth cause of action); common-law dissolution of the corporation (seventh cause of action); and derivatively, breach of fiduciary duty by the individual defendants (eighth cause of action); and constructive trust (tenth cause of action). The claims for punitive damages were dismissed upon the prima facie motion based upon the failure to plead egregious or malicious conduct which would warrant such recovery.
Defendants interposed four counterclaims against Cortes claiming damages for conversion of money and corporate property for his own purposes, misrepresentation of corporate expenses, breach of the contract to sell his shares to defendants for the sum paid for such shares and various alleged breaches of his duty to perform his duties as manager in a responsible manner. This court dismissed defendants’ first and second counterclaims for conversion and fraud as a matter of law based upon inadequacies in the pleading. In response to plaintiffs in limine motion prior to trial, the court precluded any evidence of sexual harassment as alleged in the fourth counterclaim as no such evidence had been adduced in response to discovery demands.
A trial was held before this court, sitting without a jury, commencing on May 12, 2014, and concluding with summations on July 7, 2014. Nine witnesses testified, four of whom gave testimony based upon their expertise in various fields. One witness, Bobby Kim, defendants’ prior counsel, was produced from his place of incarceration, but it was determined that his testimony was unnecessary. Posttrial written submissions have now been received. The court makes the following findings of fact and reaches the following conclusions of law.
Findings of Fact
On his direct case, plaintiff testified that he had met defendant DeSimone while employed at Giovanni’s restaurant in New York County and was offered a “partnership” in the new restaurant Cabo in return for $50,000, which he paid on August *674 9, 2003, to Ramunni and DeSimone, partly in cash and partly by check, as consideration for his 16.67% interest, for which he was promised a salary and his proportionate share of the profit from Cabo. He testified that he had borrowed the money from his brother-in-law, who had taken a bank loan. Plaintiff worked at Cabo as the day manager and was initially paid $700 per week, which was increased in 2005, apparently in response to the intervention of Robert Anker, Esq., an attorney hired by plaintiff, to $1,000 per week, in addition to cash received in an envelope in amounts between $250 and $1,500, totaling $25,000. While he paid taxes on the salary he received by check, he did not pay taxes on the cash and there is no documentation of such cash payments. In 2009, the cash payments ceased. Plaintiff described Ramunni as in charge of financial matters and the one to whom he most frequently spoke about his share of profits and the opportunity to review the books of Cabo. Plaintiff testified that DeSimone “oversaw” the dining room, but only appeared at the restaurant, for 20 minutes, three or four times a week. Generally, plaintiff was in charge of all aspects of day-today management. At the end of each shift, he would turn over to Nathan Birkenfeld, the night manager, the server reports that had been generated in the course of the day.
Cortes admitted that he consumed substantial amounts of alcohol while on the job and that he occasionally fell asleep. This problem was discussed with defendants who asked him to stop. He attended an alcohol treatment program briefly, but continued to drink at work, explaining that he was required to taste the sangria and margaritas prepared daily to be served to patrons. Following the expansion of the restaurant from 74 to 150 or 160 tables, in 2010, because he was “miserable,” working long hours and commuting to his home in Brooklyn 2x!z hours each way, he “quit.” Cortes insisted he was not fired and that his compensation was never cut during his employment, nor was his job performance affected by his consumption of a bottle of wine each day, although, after he commenced suit, defendants accused him of stealing and sexually harassing women at work.
After terminating his employment, plaintiff sought to sell his shares to defendants, who, under the terms of the agreement, had the right to buy him out upon his failure to continue to serve as manager, but the price offered, $50,000, was not acceptable to plaintiff. Defendants have declined to offer more, insisting, as demanded in their third counterclaim, that plaintiff *675 was obligated, under the agreement, to accept the return of his $50,000 investment in exchange for his shares. Plaintiff testified that he repeatedly asked for his 16.67% share of the profits, but was told defendants were going to recoup their investment first. The tax returns for the corporation, in evidence, show no, or only minimal, profit. However, it is plaintiffs contention, and the gravamen of his suit, that substantial sums of cash received daily from customers in payment, were not reported and were diverted to the individual defendants. Plaintiff testified that he observed stacks of cash in a safe in a locked basement office, to which he also had the combination, and that he had regularly accessed such cash to pay bartenders and vendors, as instructed by Ramunni.
Plaintiff called both individual defendants on his direct case. Angelo Ramunni, who is the chief financial officer for Cabo and was most directly involved in the day-to-day authorization of payments and monitoring of sales, testified that he owns three businesses, two, with DeSimone, whom he has known for 35 years. Ramunni acknowledged that not all of the cash collected at Cabo was deposited in the Cabo bank account, but that some vendors and employees were paid in cash. He would go to the restaurant daily in the morning to check the receipts against the cash. Ramunni testified that he gave the original daily server reports[3] to the corporate accountant, Alan Lipke, each month, without retaining a copy for the restaurant. Ramunni recalled that a demand for books and records had been made in the spring of 2011, but it was not until his deposition on July *676 19, 2012 that the existence of the server reports was revealed to plaintiffs counsel. The server reports, which proved critical to plaintiffs case, were not produced until October 5, 2012, in open court following a hearing, upon court order (see order of Oct. 5, 2012). Ramunni also acknowledged that there are no bylaws for the corporate defendant, no elections of officers or directors have been held and that, in fact, there are no directors.
Ramunni testified that Cabo opened in 2004,[4] but only became profitable in 2013, after plaintiffs departure. Ramunni stated that Cabo was never profitable prior to 2013 when business “exploded.” In April 2012, a fire occurred which limited operation of the restaurant for four to six months. In the course of repair, seating and kitchen capacity were expanded and an outdoor patio was added which opened at the end of August 2012. Ramunni explained the substantial increased profitability in 2013 as the result of his and DeSimone’s greater involvement in management after plaintiffs departure, better ordering of better quality food, and the absence of plaintiff in a drunken condition. However, Ramunni admitted that in 2009 or 2010, a New York State sales tax audit had concluded that sales had been underreported and that approximately $90,000 in tax was owed, which was paid without challenge.
DeSimone testified that he was employed at Caliente Cab Company and Peter’s Clam Bar, as well as defendant 3A North Park Avenue Restaurant Corp. (3A North Park), and split his time among the various locations. He was primarily questioned on plaintiffs case with respect to an affidavit he had submitted regarding compliance with a document request. DeSimone stated that he did not manage the financial records and had only obtained the bank statements. He stated that he did not believe the server reports generated daily and turned over to the accountant for use in preparation of financial statements and tax returns are electronically stored information which were required to be provided to counsel in response to discovery demands. DeSimone testified that he thought the tax returns and bank statements adequately responded to plaintiff’s demands. This court does not find this testimony credible. DeSimone testified that meetings regarding the business were held between himself and Ramunni and plaintiff, but that no minutes were kept.
*677 This court presided over numerous attempts by plaintiff to obtain the records necessary to confirm his suspicions that the two majority shareholders—the only shareholders identified on the tax returns as 50/50 shareholders—had been diverting substantial sums of cash to themselves and had breached their fiduciary duty to him and the corporation. The court infers, from the pattern of delay and obfuscation in responding to the numerous requests for records, that the individual defendants deliberately frustrated plaintiffs efforts and, in failing to disclose to the minority shareholder the actual profits of the restaurant and refusing to give him his 16.67% thereof, breached their fiduciary duty to him. Had defendants responded timely to plaintiffs legitimate requests for sales records, the server reports, which ultimately proved critical to plaintiffs case, would have been more complete and would have provided a basis to determine the actual cash receipts on a daily basis. It is defendants’ deliberate concealment of the sales records, particularly the server reports, that they knew would reveal their defalcations, that warrants acceptance of the projections of the expert based upon the limited records produced (see Matter of Rothko, 43 NY2d 305, 323 [1977]).
Plaintiff argued throughout the trial that the individual defendants were underreporting the restaurant’s revenue, the majority of which was cash, that the individual defendants controlled the access to the cash, significant sums of which they did not deposit into the corporation’s bank account, and that the individual defendants diverted cash funds from the corporation for their personal benefit in breach of their fiduciary duty to the plaintiff. Following the belated production of the server reports for the period between July 2011 and July 2012[5]
[6](the only sales records produced to the plaintiff during discovery), in order to demonstrate that the reported revenue in the year-end income statements and federal tax filings was inaccurate, plaintiff sought an expert analysis of the limited information provided.® All credit card payments are processed by an independent servicer, Sterling Funding, which initially advances the sums charged by credit card and then deposits the funds directly into *678 Cabo’s bank accounts, less its processing fee.[7] Thus, the amount of income derived from credit card purchases is readily ascertainable and is reliable and precise, while, as Ramunni testified, not all of the cash was deposited into the corporation’s bank account as certain vendors and employees required cash payments and some of the cash was paid to the servers as tips.
To calculate the sum of alleged damages, plaintiff sought to determine the ratio of the restaurant’s revenues received in the known deposited credit card amounts to the cash received as reflected in the server reports. Using such ratio, plaintiff believed he would be able to ascertain the amount of unreported cash that had been received during the period of his stock ownership. As the server reports were voluminous and incomplete, plaintiff sought to select a sample of server reports that would accurately reflect the cash to credit ratio of revenue received by the restaurant. Plaintiffs counsel contacted the former chair of Columbia University’s Department of Statistics, Dr. David Madigan, a professor of statistics who holds a Ph.D. in that field. Madigan was asked by plaintiffs counsel to select a number of random dates, during the time period for which server reports were available, that would constitute a statistically significant sample size in order to determine what percentage of the restaurant’s revenue was received in cash. At trial, Madigan, who was acknowledged to be a statistics expert, testified that he had randomly selected 11 dates from the relevant time period, along with backup dates for each date in the event that the server report for the first selected date was not available, and had given the list to plaintiffs counsel. Each of the 11 dates was selected from a different month. Madigan testified that his work in this action was pro bono and he was not compensated for his services.
Madigan’s randomly-selected sample was supplied to Michael J. Garibaldi, a New York State certified public accountant since 1984, with an extensive background in forensic accounting, business valuation and reconstruction of financials of closely held companies, and accredited in business valuation and certified in financial forensics by the American Institute of Certified Public Accountants. He is the president and CEO of Israeloff, Trattner & Company, an accounting firm. Although he testified *679 that he had had no direct contact with Madigan, Garibaldi found the use of a sample of 11 dates from a single year to project business activity over a period of 11 years to be entirely appropriate and a generally accepted procedure in the forensic accounting community, which frequently uses sampling in both forensic accounting and auditing.
Garibaldi was accepted as an expert in forensic accounting and business valuation. He prepared an expert report dated November 22, 2013 (plaintiffs expert report)[8] based upon 3A North Park corporate documents, including federal tax returns from 2003 through 2010, financial statements for the fiscal years ending July 31 for 2008 through 2011, monthly bank statements for the period December 2003 through September 2012, the server reports from July 2011 through July 2012, and deposition testimony and correspondence. Based upon defendants’ failure to respond to notices to admit, the cash deposits reflected in the bank statements and the costs and expenses reported in the tax returns were deemed to be accurate.
Garibaldi reviewed the server reports from the 11 dates selected by Madigan (which numbered 92), calculated the total amount of cash actually received by the restaurant on those dates, and compared it to the actual credit card payments on the same dates, and concluded that, between July 2011 and July 2012, 45.6% of the revenue was paid by credit card and 54.4% of the revenue was received in cash (credit/cash ratio). After adjusting for an 8.625% sales tax and an 18% tip rate,[9] Garibaldi applied this credit/cash ratio to the automatic credit card bank deposits to estimate the cash revenue received during this period. As these server reports were the only documents provided to plaintiff that indicate the actual cash received by the restaurant, other than bank statements listing deposits which concededly do not correspond to the cash actually received, Garibaldi also applied this credit/cash ratio to all credit card deposits for the corporation from 2003 through 2013. When asked on cross-examination whether the 11-day sample was not *680 representative of an entire year because of the number of weekend and holidays in the sample, which would increase the overall sales,[10] Garibaldi responded that he only used the sample dates to determine the ratio of credit card payments to cash payments and not to determine the total sales revenue. Thus, the presence of increased sales on any particular date would be irrelevant.
In his expert report, Garibaldi concluded that, based upon his credit/cash ratio analysis, the cash deposited in the corporation’s bank account was only a small fraction of the total cash revenue received and the corporation’s estimated profits were significantly underreported. He testified that, applying the credit/cash ratio to the credit revenue since the restaurant opened in November of 2003 through the end of 2013 to determine total revenue, and deducting the costs and expenses as reported in the tax returns, Cabo had a projected profit of $7,347,912. Accordingly, Garibaldi concluded that plaintiffs 16.67% share of those profits is $1,224,896.93. To determine the present value of the business, Garibaldi indicated “that a multiple of between 3 and 5 of net income is appropriate to estimate the value of the business.” Accordingly, Garibaldi estimated the value of the corporation, based on his estimated adjusted net income of $1,093,048 for the year 2012, to be between $3,279,144 and $5,465,240. Plaintiffs 16.67% interest in the corporation would then be worth between $546,633 and $911,055. [11]
After reviewing defendants’ expert report, prepared by Howard Cannon, CEO of Restaurant Operations Institute, Inc. in Chelsea, Alabama, who, though not an accountant, was accepted as an expert in “restaurant operations and business restaurant evaluation,” Garibaldi issued a supplemental expert report, dated April 16, 2014 (plaintiffs supplemental expert report), addressing the daily consolidated system menu item sales summary (sales summary) relied upon by Cannon.[12] According to the sales summary, the net sales total in the one-month period *681 between December 23, 2012 and January 23, 2013 was $202,421.70. Garibaldi concluded that this one-month total suggests yearly sales of at least $2.43 million,[13] more than double the revenue reported on the 2012 financial statement and substantially more than the $2,237,551 in revenue for 2012 estimated in the plaintiffs expert report based upon the server reports. Garibaldi then averaged the credit card deposits reflected in the bank statements for the months January and February for the years 2005-2012 and compared that average to the average monthly credit card deposits over the entire eight-year period, finding that the monthly January-February deposit is 22.5% lower than the overall monthly average. Multiplying the $202,421.70 from the sales summary for December 2012-January 2013 by 12, and adjusting for the 22.5% purported increase in projected actual revenue, he determined that the estimated yearly sales for 2012 would be closer to $2.98 million than $2.43 million. Accordingly, Garibaldi testified that the sales summary supports the plaintiffs contention that the revenues at the restaurant are significantly higher than had been reported. Garibaldi therefore recalculated the corporation’s profits between 2003 and December 1, 2013, based upon the sales summary, to be $9.78 million, of which the plaintiff is entitled to $2.25 million (inclusive of interest). Garibaldi estimated the value of the corporation, based on his recalculation of the net income, to be between $4.35 million and $7.25 million. Deducting the $2.25 million owed to plaintiff for profits as calculated above as a corporate liability, Garibaldi concluded that plaintiffs 16.67% interest in the corporation is worth between $350,000 and $833,000.
Although the court agrees that the sales summary, supplied by defendants, does support the plaintiffs contention that sales at the restaurant were significantly higher than were reported in the financial statements, the court does not accept Garibaldi’s recalculation of the lost profits in the plaintiffs supplemental expert report based entirely upon the proportional discrepancy between the revenue for the single month reflected in the sales summary and the average monthly sales for the entire eight-year period. Whereas the net income or profits in the *682 plaintiffs expert report were methodically calculated based upon known deposited credit card amounts and reported expenses,[14] the plaintiffs supplemental expert report seeks to increase all of the previously calculated amounts by one third based on one 30-day sales summary that does not reference the corporation’s expenses and is not, as acknowledged by Garibaldi, an accurate representation of a typical month. Further, there was undisputed testimony that the restaurant’s kitchen was significantly altered after the fire in April of 2012 and seating was expanded, particularly with the opening of the outdoor patio in August, that would substantially account for the greater sales at the end of that year and into 2013. Accordingly, the court declines to accept Garibaldi’s recalculation of lost profits in the plaintiffs supplemental expert report and those calculations are disregarded.
Plaintiff also called Alan Lipke, the accountant for 3A North Park since its formation in 2003, whose testimony was frequently contradictory and unreliable, at best. However, Lipke did acknowledge that Cabo had been the subject of a New York State tax audit for the years 2007 through 2009 which had determined a liability for unreported sales for which taxes were due. The results were uncontested and the tax due, approximately $69,000, plus interest and penalties of approximately $12,000, was paid. Lipke testified that he thought the sum alleged to be due was substantially accurate. A year later, a franchise tax audit was conducted and Lipke was asked to explain where the additional sales reflected in the sales tax came from and where the money went. According to Lipke, upon production of receipts for cash payments to vendors, the questioned returns were accepted without change. Lipke further testified that he did not know of Cortes’ interest until the instant suit was commenced. In contradiction to Ramunni’s testimony that he gave the original server reports to Lipke on a monthly basis, Lipke testified that, prior to the tax audit in 2009, he had no knowledge of the computerized daily server reports but first received them during the sales tax audit, so he could “figure out . . . what the percentage would be [of credit card to cash],” and had not seen them again since the end of that audit in 2009. He testified that, although he could not *683 remember the ratio, it was “in the ballpark of the range of what normal restaurants in his [sic] caliber would be” (tr of May 19, 2014 at 22).
Lipke testified that he acted as the accountant for approximately 20 full service restaurants and was stipulated to be an expert in full service restaurant accounting. He testified that he prepared financial documents, including tax returns, entirely from the corporation’s bank statements and relied upon Ramunni’s verbal statements regarding the amount of sales in cash in order to provide sales tax returns. No documentation accompanied such verbal reports and Lipke had no idea how such number was derived. Lipke was evasive regarding his review of the payroll records, responding that a payroll company was involved and that he did not know whether plaintiff received a salary. Lipke testified that the corporation lost a total of $65,353 from its inception through July 31, 2011 and never declared or paid a dividend, but only “paid salaries to shareholders as members” (Lipke aff of Dec. 20, 2012, plaintiffs exhibit 39). Since Cortes was never acknowledged to be a shareholder, it is clear that he did not receive compensation as a shareholder. Lipke explained that, despite earlier losses, in the year from November 1, 2012 to October 31, 2013, Cabo’s sales increased to $2.7 million from the prior average of $1.1 to $1.2 million, due largely to the expansion of the facility after the 2012 fire. Lipke further stated that closely held restaurants do not generally pay dividends, but compensate the shareholders in salary, that the salaries paid to Ramunni and DeSimone were “in line” with industry standards, that he had found no indication of irregularities in the bank statements and that all funds were paid out for corporate purposes.
Lipke reviewed the plaintiffs expert report and, although he did not contest the specific mathematical computations in the report, he stated that Garibaldi’s finding that only 45.6% of the sales were by credit card was “impossible” based upon his experience and familiarity with other restaurants. Lipke supplied his own projection of a cash to credit ratio based upon a ratio to the rent as applied to the credit card deposits made to the bank account, less tips and sales tax. Analyzing each year from 2004 through “all the years,” he concluded that the ratio of cash to credit revenue averaged approximately 35/65.[15] He testified that the credit card percentage of income in the restaurant business *684 generally was never below 60%. When asked if he had any basis for determining whether the cash to credit ratio would vary depending on a particular day of the week, Lipke testified that he did not have any basis for knowing one way or the other. Lipke also testified that he disagreed with Garibaldi’s valuation of the restaurant and that the value of a restaurant is between 40 and 60% of the gross sales. This testimony is rejected, however, as without foundation and well beyond Lipke’s field of expertise.
Defendants argued throughout the trial that the restaurant was losing money each of its first 10 years and did not become profitable until 2013, as reflected in their profit and loss statements, as well as their tax filings. They offered no expert analysis to controvert Garibaldi’s testimony regarding his projection of actual unreported cash revenue, other than the testimony of their accountant Lipke. However, they did offer an alternative expert valuation of the business.
At trial, defendants called Howard Cannon, a certified forensic consultant with a Master’s degree in business administration and extensive practical experience in the restaurant industry, who had never testified as an expert in business valuation, had never taken a course or been certified in business valuation, had never published in the field of business valuation and did not belong to any professional organizations.[16] Cannon issued his expert report on December 4, 2013 (defendants’ expert report), in which he relied upon a current menu for the restaurant, profit and loss statements for fiscal years 2010 through 2012, tax returns between 2009 and 2012, affidavits from the accountant Lipke and Ramunni, a letter from the New *685 York State tax auditor regarding a franchise tax audit, and the sales summary from the restaurant for the period of December 23, 2012-January 23, 2013. Cannon indicated that he reviewed approximately 88 pages of documents in total, but did not review the restaurant’s bank statements or the server reports relied upon in the plaintiffs expert report. In both his written report and in his trial testimony, Cannon emphasized the importance of reliable, accurate information regarding the volume of sales in assessing the value of the business, but relied exclusively on the affidavit of accountant Lipke and the tax returns and financial statements he prepared, together with verbal communications with defendants’ attorney and the affidavit of Ramunni as a corporate officer, to determine the value, without reviewing any of the primary records or such independent source as the bank records to verify the accuracy of the information he was given. He testified that he did not consider any liabilities of the corporation in making his valuation, but was required to accept the numbers in the tax returns and rely upon the CPA Lipke and “the bookkeeper” (apparently Ramunni).
In his report, Cannon noted that there are three methods that can be used to determine the value of a restaurant, but “based on the limited number of documents [he was] provided to review for this matter, that one can only use the verifiable gross sales method to determine an initial value for this subject establishment.” The defendants’ expert report stated, “[a]s a general restaurant industry valuation rule, a restaurant valuation can most easily be gleaned by assessing a value that is equal to 30 to 35% of the verifiable gross sales of the business.” Cannon relied upon an affidavit from Lipke that the gross sales volume for November 1, 2010 through October 31, 2013 was $5,014,424. Although not explicitly stated in the defendants’ expert report, Cannon apparently divided this number by three and used it as the average of annual gross sales of the business. This was then multiplied by 30% and 35% to arrive at an “initial data-point for the Fair Market Value” for the restaurant of between $501,000 and $586,000. Cannon further stated that the “potential impact of yet-to-be determined minor influences of plus or minus fifteen-percent” would expand that range to $425,000 to $674,000, although Cannon was not provided the information necessary to assess such influences, rendering such opinion speculative. Based upon this analysis, plaintiffs 16.67% share of the corporation was projected by Cannon to be worth between $70,848 and $112,356. At trial, and in his expert report, *686 Cannon stated that since plaintiff is a minority shareholder without decision-making authority, his shares are not desirable and this value would be further reduced by 30-50% to a range of $35,424 to $78,649. Cannon took particular note of the difficulty in determining the value of an independent restaurant, like Cabo, because such businesses are largely cash-based, making verification of “dividends” (the return to the owners), elusive. The court notes that such difficulty would also arise with respect to a valuation based on gross revenues if cash revenue is diverted or inaccurately recorded. Cannon did not address the issue of the restaurant’s profits, if any, or plaintiffs share of those profits, ás he was only asked to address the value of the business, describe his method in making the determination of value and set the value of plaintiffs shares on the open market.
The defendants’ expert report includes a number of notable caveats. Cannon explained that for the gross sales method of valuation to be accurate, “gross sales numbers must be verifiable by a Certified Public Accountant (CPA) that is licensed in the state where the establishment is operating” and could not “stress enough that a valuation is only as good as the verifiable data and verifiable information that can be provided and used to assess the value from.” Further, Cannon stated:
“It should be noted that I am not a Certified Public Accountant, nor was I asked to review any of the numbers pertaining to this matter to determine if I had any opinion as to the accuracy or authenticity of the sales, expenses, and/or profits or losses of the subject establishment; rather, I was asked to opinion off of the numbers that I was provided and assuming that all numbers provided were true and accurate.”
At the conclusion of the defendants’ expert report, upon review of the plaintiffs expert report, Cannon noted:
“Based on my very brief and initial cursory review of the [plaintiff’s expert report] and prior to [defendants’] counsel requesting that I do not review and/or consider any further due to cost and time constraints, I recognized that clearly Mr. Garibaldi was provided access to significantly more financial information and significantly different data-points to consider than what I was provided. I am not a Certified Public Accountant and, therefore, cannot attest to the validity and/or accuracy of any of the financial data-points used and/or collected by Mr. *687 Garibaldi in any way at any time. Further, I am not able to opine at this time about the methodology used or the opinions arrived at within Mr. Garibaldi’s report without expending significantly more time on this matter.”
As is evident from Mr. Cannon’s own disclaimers, the expert opinion proffered by defendants is fraught with speculation, is without a reliable foundation in professional analysis, and begs the very question raised in this litigation: what were the actual sales revenues of the restaurant in the years prior to commencement of this action.[17] Although plaintiffs counsel accepted Cannon as an expert, this court does not find him qualified to provide a competent opinion regarding the value of Cabo as a business, particularly in light of the suspect nature of the information provided to him.
Testifying on their direct case, Ramunni and DeSimone described the agreement between Ramunni and Cortes as limited to a right to repurchase Cortes’ shares at the $50,000 price he had paid for them if he ceased working as the daytime manager of Cabo. According to DeSimone, plaintiff was encouraged to “buy [himself] a job.” Both defendants testified to plaintiff being drunk on the job and their efforts to get him alcohol treatment. They both also described plaintiffs performance as inadequate, that he was overpaying vendors for supplies, that he was overstaffing the restaurant, that his mismanagement had resulted in unspecified losses and that business declined because of his drinking. Although no allegation of outright stealing was pursued, defendants claimed that plaintiff sometimes failed to account for all of the sales at the end of the day and “misappropriated” funds by incurring inappropriate expenses. Both defendants testified that no dividends had ever been declared but that the salaries paid to them and plaintiff were their only compensation. Both defendants further testified that plaintiff never asked to review the financial records but that informal discussions were held regarding the business. Ramunni testified that his failure to advise Lipke of plaintiffs ownership interest was an “oversight.”
*688 Defendants’ Counterclaims
At the close of defendants’ case, plaintiffs CPLR 4401 motion to dismiss the remaining third and fourth counterclaims was granted as to the third counterclaim alleging a breach of the “contract” to accept $50,000 in return for his shares upon his departure from employment as the daytime business manger. Defendants claimed they had offered $50,000 for plaintiff’s shares, but that he had refused their offer. They argued that they should not be required to increase the offer since the agreement only specified a right of first refusal. Counsel further contended that plaintiffs departure effected a termination of the business relationship. Ruling on the motion, the court found that the clear language of the agreement provides no indication that the purchase price was limited to $50,000. Nor, upon the evidence, would such limitation be rational. Plaintiff was employed elsewhere at the time he was solicited by DeSimone to manage Cabo and appears to have been making more than the $700 a week initially paid to him at Cabo. He was traveling hours each day and working at least 15 hours a day, until 1:00 or 1:30 a.m. Moreover, he borrowed the $50,000 from his brother-in-law who, in turn, had taken a loan. There is no reasonable possibility that plaintiff had purchased his shares just to secure the job as manager, without the promise, and expectation, that he would be sharing in the profits. Further, it does not appear that any relief is even requested in the third counterclaim as defendants were accorded their right of first refusal at the price they were willing to pay, unless defendants are seeking a direction to plaintiff to accept the $50,000 and convey his shares. Such direction is not warranted by the language of the agreement or the evidence. Accordingly, although the court initially reserved on the complete dismissal of the third counterclaim, upon the assumption that defendants also sought to enforce a right to buy plaintiff out upon his departure, there is no merit to the third counterclaim upon the evidence or as pleaded and it is dismissed.
Defendants’ fourth counterclaim, insofar as it survives, is based upon plaintiffs alleged breach of his employment contract in continuing to be “inebriated on the job” and failing to perform his duties properly, thereby causing the business to lose “opportunities.” As plaintiffs counsel pointed out, there is no claim or evidence of a faithless employee that would justify a recovery against plaintiff and there is no evidence of actual damages other than general claims of a diminution in business. *689 Plaintiff himself admitted that he frequently consumed significant quantities of alcohol while working, but there is no actual contract of employment that defines the terms such that simply consuming alcohol would constitute a breach of contract. Defendants tolerated any inadequacies in plaintiffs performance, relying on him to manage the restaurant, pay vendors, purchase food and staff the restaurant, as well as collect the days’ receipts, until he quit. This court does not credit the testimony of defendants with respect to plaintiffs inadequacies in light of their own admissions regarding the extent of his responsibilities, finding such testimony to be tailored and not credible. Moreover, the right of an employer to be compensated by an employee is limited to a breach of the employee’s duty of loyalty and good faith by acts of actual misconduct and disloyalty that are contrary to the employer’s interests, thereby depriving the employer of profit and enriching himself at the employer’s expense (see e.g. Phansalkar v Andersen Weinroth & Co., L.P., 344 F3d 184, 200-203 [2d Cir 2003]; Lamdin v Broadway Surface Adv. Corp., 272 NY 133, 138-139 [1936]; Rodgers v Lenox Hill Hosp., 239 AD2d 140, 147-149 [1st Dept 1997, Rubin, J., dissenting]). There is no evidence of any profit gained by plaintiff at defendants’ expense or of any acts of disloyalty. Under such circumstances, defendants’ only recourse, in the face of what they contend were inadequacies or negligence in plaintiff’s job performance, was termination (Burke v Steinmann, 2004 WL 1117891, *7, 2004 US Dist LEXIS 8930, *20-23 [SD NY 2004, No. 03 Civ 1390 (GEL)]; cf. Feiger v Iral Jewelry, 41 NY2d 928 [1977]; cf. Bravin v Fashion Week, 73 Misc 2d 974 [Civ Ct, NY County 1973]). Despite their suggestion that plaintiffs performance was so tainted by his alcohol consumption during working hours that he was incompetent in executing his responsibilities, they never fired him and retained his services as the sole daytime manager, in control of all aspects of the business under Ramunni’s direction, for seven years, until he quit.[18] Accordingly, defendants failed to prove their fourth counterclaim for breach of the employment contract and the claim is dismissed.
Plaintiffs Claims
Addressing plaintiffs claims, considering the testimony of all witnesses, the expert reports, and the corporation’s financial *690 records in evidence, it is clear that significant cash receipts were not reported in the corporation’s tax returns and records and plaintiff was thus deprived of his share of significant profits that were diverted by defendants. The server reports for the eight dates sampled between July 9, 2011 and April 1, 2012 (prior to the fire on Apr. 12) demonstrate that the restaurant received between $6,386 and $9,908 nightly in cash payments on the randomly selected Fridays and Saturdays (when the restaurant was busy and operated as a bar and club late into the early morning hours), and on non-holiday weekday nights, when the restaurant was fully operational,[19] the server reports for randomly selected dates indicate that the restaurant received between $1,327 and $1,815 in cash payments nightly. However, the bank account statements demonstrate that, during this same time period, no more than $5,300 in cash was deposited into the corporation’s bank account in any given month. It is thus apparent that substantial receipts in cash were diverted. Defendants’ explanation that cash was paid to certain vendors and employees is not corroborated with documentation of any kind and does not account for the sums actually unreported. While the total amounts of cash diverted from the corporation each year in plaintiffs expert report is based upon an extrapolation, using a formula based upon the proportion of credit to cash receipts as reflected in the only reliable evidence produced, the server reports for 11 months, the court finds the conclusions of plaintiffs expert, Garibaldi, with respect to the amount of cash diverted, to be reliable and grounded in competent analysis of the available data.
Although challenged by defendants, the court finds the statistical random sample generated by Madigan from the server reports provided for 11 months to be an appropriate method of sampling for the purpose of projecting cash receipts over the entire period at issue where inadequate records have been provided and finds the particular sample to be statistically significant. It is noted that the Appellate Division, Third Department recently upheld the New York State Department of Taxation and Finance Audit Division’s use of one sample day’s cash to credit ratio, from a restaurant that kept inadequate cash *691 sales records, in order to determine the cash revenue for a period of over 2V2 years (Matter of Hwang v Tax Appeals Trib. of the State of N.Y., 105 AD3d 1151 [3d Dept 2013]; see also Matter of King Crab Rest. v Chu, 134 AD2d 51 [3d Dept 1987]). The evidence here of the findings of a sales tax audit by New York State in 2009 or 2010, for the preceding three years, in which it was determined that the corporation owed in excess of $80,000 in back sales tax, interest and penalties, which the corporation declined to contest and paid,[20] corroborates Garibaldi’s conclusions that significant sums of cash were diverted from the corporation, which would have been profit, in which plaintiff would be entitled to share.
By his own testimony, it was established that Ramunni acted as the corporation’s bookkeeper and was responsible for the distribution of the cash received by the corporation, as well as all financial reporting to the corporation’s accountant. Each morning he compared the daily server reports to the amount of cash given to him as taken in the day before. Cortes testified to having observed stacks of cash in a safe in the basement office. Although Ramunni testified that cash withheld from the corporation’s bank account was used to pay employees, vendors, and tips, the court does not find such explanation sufficient in light of the size of the discrepancy between the amount of unreported cash and the records of Cabo’s expenses. While plaintiff did not contest the defendants’ distribution of tips to servers in cash, which was accounted for in Garibaldi’s calculations by deducting from the actual credit receipts a conservative estimate of 18*%;[21] this court’s review of the bank account statements admitted into evidence, and the corresponding financial statements, reveals that numerous vendors, employees, and the individual defendants themselves, were paid each month by check.[22] No receipts for cash, or even invoices for purchases, or employment records, which defendants are required by law to maintain, *692 were offered in evidence to substantiate any cash payments. Accordingly, the defendants produced insufficient evidence to support their contention that large sums of withheld cash were used to pay the corporation’s expenses, including employee’s wages and vendor payments.
Lipke testified that the sole method by which he determined the corporation’s cash revenue, for inclusion in its financial statements and tax returns, was from verbal reports by Ramunni without any documentary support. This testimony seriously undermines Lipke’s professional competence as an accountant and renders him incredible as a witness regarding the corporate earnings. Any records he prepared were clearly inadequate as a reliable indicator of the value of the corporation. Accordingly, this court finds that the revenue reported in the corporation’s financial statements and tax returns is inherently inaccurate. Similarly, as no accurate accounting was made of the cash received on a daily or monthly basis, the amount of cash deposited into the bank account of the corporation is also an unreliable means of determining the corporation’s cash revenue.
In light of defendants’ failure to provide any reliable records, other than the server reports, of actual revenue of the corporation, this court finds the projections of revenue based upon the credit/cash ratio, as described in plaintiff’s expert report and the testimony of Garibaldi, to be the appropriate method by which to assess the extent of defendants’ diversion of cash revenue and determine the true value of the corporation. The court is satisfied that Madigan randomly selected a statistically significant sample of server report dates for Garibaldi to review in order to determine the cash to credit card ratio and is satisfied that a rational basis exists for Garibaldi’s calculations. Garibaldi is a recognized, and highly experienced forensic accountant, expert in the field of evaluation of closely held corporations, particularly where, as here, the parties have sought to hide the true value and the extent of their defalcation. Although the defendants repeatedly sought to discredit Garibaldi’s conclusions at trial, the defendants did not provide their own expert, Cannon, with the server reports or bank statements relied upon by Garibaldi, precluded Cannon from reviewing Garibaldi’s report, and did not retain Cannon, or any other independent expert, to analyze plaintiffs allegations of diverted cash and lost profits. Although Lipke testified that he never saw a restaurant with less than a 60% credit card to 40% cash ratio, he did not contest *693 Garibaldi’s method of calculating the estimated cash payments or contest Madigan’s selection of random dates. While defendants challenged the application of the credit/cash ratio to any time frame outside the period of July 2011 to July 2012, arguing that the ratio was derived from the server reports for only that period, it is defendants’ failure to maintain and/or produce records for any other period (other than, belatedly, for the sales summary period of Dec. 2012 to Jan. 2013) that has necessitated the use of the ratio for the entire relevant period. The defendants cannot be permitted to benefit from their purposefully inadequate record-keeping, as a means of concealing their diversion of funds, to defeat plaintiffs claims. The sole reason that the plaintiffs expert applied the credit/cash ratio over the course of a number of years is because the defendants maintained such inadequate, and obviously fraudulent, records. It is noted that the defendants’ own expert witness, Cannon, testified at trial that the frequency of credit card use at restaurants has been increasing over the past 10 years, which suggests that the application of the credit/cash ratio, dating back to 2003, may actually be a conservative estimate of the earlier cash payments to the restaurant.[23] As the plaintiff presented proof of the diversion of assets, and the “difficulty faced in calculating damages is attributable to the defendant[s’] misconduct,” the level of uncertainty with respect to Garibaldi’s approximation of the loss is permissible (Wolf v Rand, 258 AD2d 401, 402-403 [1st Dept 1999]; see Matter of Rothko, 43 NY2d 305, 323 [1977]; Gibbs v Breed, Abbott & Morgan, 271 AD2d 180, 188-189 [1st Dept 2000]; Milbank, Tweed, Hadley & McCloy v Boon, 13 F3d 537, 543 [2d Cir 1994]).
Accordingly, the court finds that Garibaldi’s application of the credit/cash ratio to all of the credit card deposit records of the corporation, in order to estimate the total amount of undisclosed cash that was diverted to the individual defendants, was warranted, given the defendants’ misfeasance and malfeasance in providing adequate records. Accordingly, this court finds the application of the credit/cash ratio of 45.6% credit card payments to 54.4% cash payments to be reliably based upon the available records and such method of calculating the amount of cash diverted to be appropriate. Based upon Garibaldi’s calcula *694 tions, the court finds that $3,719,407 of the $11,246,703 in projected gross revenue for the period 2003 to the filing of the complaint on June 13, 2011, was diverted by defendants.
Conclusions of Law
Breach of Fiduciary Duty
“In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant’s misconduct” (Kurtzman v Bergstol, 40 AD3d 588, 590 [2d Dept 2007]). “A minority shareholder in a close corporation is owed a fiduciary duty by the majority shareholders” (O’Neill v Warburg, Pincus & Co., 39 AD3d 281, 282 [1st Dept 2007]; see Gjuraj v Uplift El. Corp., 110 AD3d 540 [1st Dept 2013]). As the plaintiff is a minority shareholder, he is owed a fiduciary duty by the individual majority shareholder defendants to scrupulously guard the assets of the corporation and honestly account to plaintiff for the application thereof. There was extensive testimony that Ramunni had control over the corporation’s cash deposits, was responsible for comparing the cash placed in the safe to the cash reported in the server reports on a daily basis, reported the amount of cash received to the accountant, and directed how the cash was distributed or deposited into the corporation’s bank account. While DeSimone appeared to have less involvement in the day-to-day management of the restaurant, he testified that he did not believe he had a duty to treat plaintiff as a shareholder entitled to share in the profit of the business but that plaintiff had merely “bought himself a job.” DeSimone acknowledged plaintiff’s $50,000 capitalization of Cabo and his extraordinary hours of work supervising the operation of the restaurant. In fact, it was DeSimone who induced plaintiff to invest in Cabo, soliciting him to leave his employment in Manhattan to participate in the management of Cabo. For the duration of the trial, Ramunni and DeSimone have been represented by the same attorney and at no time has either defendant raised any allegations against the other. In the absence of any evidence that the two individual defendants did not collude in the diversion of cash and the manipulation of corporate records to disguise their defalcation, the court infers that defendants shared the diverted cash and that each participated in the effort to cheat plaintiff out of his share of the return on his investment.
Upon review of the testimony and documents introduced into evidence, the court finds that the preponderance of evidence *695 established that significant sums of unreported cash were diverted from the corporation and the accountant was given false information to be included in the corporation’s financial reports and tax returns. Although Ramunni was in primary control of cash receipts on a daily basis, DeSimone, who was also regularly present at the restaurant, consented to, and appears to have shared in, the diversion of assets. Both individual defendants were experienced restauranteurs, were regularly on the premises, and together controlled all aspects of the business. This court finds the defendants’ contention that the restaurant was not profitable for almost 10 years to be incredible in light of the evidence of expansion and the revenue reflected in the server reports. The defendants’ claim that the restaurant was losing money for 10 years and then suddenly doubled its revenue and turned a profit upon the departure of Cortes and the expansion of a back patio, is not credible. Moreover, the limited reliable financial data provided further discredits the defendants’ contentions. Clearly, defendants breached their fiduciary duty to plaintiff as a minority shareholder by diverting profits to themselves, without disclosure to plaintiff, depriving him of his right to share therein. However, although “[a] minority shareholder in a close corporation is owed a fiduciary duty by the majority shareholders” (O’Neill, 39 AD3d at 282; see Gjuraj, 110 AD3d at 541), “allegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually” (Abrams v Donati, 66 NY2d 951, 953 [1985]; see Wolf v Rand, 258 AD2d 401, 403 [1st Dept 1999] [“(e)ven where the corporation is closely held, and the defendants might share in the award, the claims belong to the corporation, and damages are awarded to the corporation rather than directly to the derivative plaintiff’]; Yudell v Gilbert, 99 AD3d 108, 114 [1st Dept 2012] [“(a)negations of mismanagement or diversion of corporate assets also plead a wrong to the corporation”]; Albany-Plattsburgh United Corp. v Bell, 307 AD2d 416, 419 [3d Dept 2003], lv dismissed and denied 1 NY3d 620 [2004]; Glenn v Hoteltron Sys., 74 NY2d 386, 392-393 [1989]). While a shareholder may have an individual cause of action “when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged” (Abrams, 66 NY2d at 953), plaintiff Cortes has not alleged any breach of an independent duty owed to the plaintiff by the indi *696 vidual defendants separate from his claim that profits were diverted from the corporation (see Herbert H. Post & Co. v Sidney Bitterman, Inc., 219 AD2d 214, 225 [1st Dept 1996]).[24] Accordingly, plaintiffs third cause of action for defendants’ breach of fiduciary duty brought in his individual capacity must be dismissed.
Although plaintiff may not recover individually against the individual defendants for their breach of fiduciary duty in diverting the assets of the corporation to themselves, as a shareholder, plaintiff has established his derivative claim on behalf of 3A North Park for breach of fiduciary duty. Defendants argue that the plaintiffs derivative causes of action must be dismissed as the plaintiff did not demand that the board of directors of the corporation commence this action prior to bringing this action derivatively (see Business Corporation Law § 626 [c]). However, the complaint specifically stated that the individual defendants, who are the majority shareholders, were responsible for all of the actions that form the basis of the complaint and any request to bring the present action would have been futile. This court finds that any request for the individual defendants to commence the present action would have been futile and the plaintiff was not required to do so pursuant to Business Corporation Law § 626 (c) (see Bansbach v Zinn, 1 NY3d 1, 9 [2003]).
Accordingly, judgment is granted to 3A North Park upon the plaintiffs derivative eighth cause of action for breach of fiduciary duty (see Abrams, 66 NY2d at 953; Wolf, 258 AD2d at 403; Yudell, 99 AD3d at 114; Albany-Plattsburgh United Corp., 307 AD2d at 419; Glenn, 74 NY2d at 392-393). However, although the court has found Garibaldi’s calculations based upon the credit/cash ratio with respect to the projected revenue to be reliable, the court declines to adopt the “net income” identified in the plaintiffs expert report as the basis for the calculation of *697 damages because it appears to equate the amount of projected profit (“net income”) with the sums of cash diverted without taking into account the cash revenues that were deposited into the bank account. The court finds that the appropriate measure of damages for defendants’ breach of fiduciary duty to the corporation is the difference between the actual revenue deposited and the projected total sales based upon the credit/ cash ratio. Accordingly, the revenue diverted from the corporation, through June 12, 2011, is $3,719,407. This calculation was reached by subtracting the actual revenue deposited from the total sales as projected by Garibaldi in the plaintiff’s expert report.[25]
Pursuant to CPLR 5001, the recovery of interest is appropriate in this action as the individual defendants failed to properly account for the corporation’s revenue for a number of years, during which time they benefitted from the use of the corporation’s funds (see Sexter v Kimmelman, Sexter, Warmflash & Leitner, 43 AD3d 790, 795 [1st Dept 2007], citing Aurnou v Greenspan, 161 AD2d 438, 440 [1st Dept 1990], lv denied 76 NY2d 713 [1990]; Eighteen Holding Corp. v Drizin, 268 AD2d 371 [1st Dept 2000]). While the court finds Garibaldi’s calculation of interest, from the midpoint of each tax year, to be consistent with CPLR 5001 (b), Garibaldi calculated that interest based upon plaintiffs individual recovery of his 16.67% of net income through December 1, 2013. Therefore, as the court is awarding a derivative judgment based on diverted revenue only through June 12, 2011, and as revenue was diverted on various dates over multiple years, pursuant to CPLR 5001 (b), a reasonable intermediate date between December 1, 2003 and June 12, 2011, October 1, 2007, appears to be more appropriate[26] (see Hayden v P. Zarkadas, P.C., 18 AD3d 500, 501 [2d Dept 2005]; Andersen v *698 Weinroth, 13 Misc 3d 1204[A], 2006 NY Slip Op 51681[U] [Sup Ct, NY County 2006]). Accordingly, the interest on the diverted revenue, calculated from October 1, 2007 to June 12, 2011, is $1,238,104.05.[27] Judgment shall enter on plaintiffs derivative cause of action in favor of 3A North Park for $4,957,511, with interest from June 13, 2011 to the date of entry.
Declaration of a Dividend
Plaintiffs fifth cause of action against all defendants seeks the declaration of a dividend. Both Lipke and the individual defendants testified that no dividend has ever been declared by 3A North Park. This evidence is undisputed. In addition, the records of the corporation, while perhaps fraudulent, do not reveal any earnings from which a dividend might have been paid. It is long-established that “[a] stockholder may not maintain an action against a corporation to recover a dividend until one has been declared” (Godley v Crandall & Godley Co., 212 NY 121, 128 [1914]; see also Jones v Van Heusen Charles Co., 230 App Div 694, 696 [3d Dept 1930]; Giacopelli v Guiducci, 2007 NY Slip Op 30893[U] [Sup Ct, Queens County 2007]). The rule does not preclude, however, recovery against individual directors who are guilty of fraud, breach of fiduciary duty and bad faith (id.), however, such relief has been sought and effectively granted under plaintiffs eighth cause of action. Accordingly, the fifth cause of action is dismissed.
Common-Law Dissolution
Plaintiffs seventh cause of action seeks common-law dissolution of the corporation. “[T]he remedy of common-law dissolution is available only to minority shareholders who accuse the majority shareholders and/or the corporate officers or directors of looting the corporation and violating their fiduciary duty” (Matter of Sternberg [Osman], 181 AD2d 897, 897-898 [2d Dept 1992], motion for lv dismissed 80 NY2d 892 [1992]). These grounds parallel, to some degree, the statutory grounds for judicial dissolution set forth in Business Corporation Law § 1104-a, which is unavailable to plaintiff because he does not *699 reach the threshold criteria of owning at least 20% of the corporation. However, the equitable remedy of judicial dissolution at common law remains available where
“the shareholders in control have been looting the company’s assets at the expense of the minority shareholders, ‘continuing the corporation’s existence . . . for the sole purpose of benefitting those in control,’ and have sought ‘to force and coerce [the minority shareholders] to sell and sacrifice their holdings to those in control’ ” (Ferolito v Vultaggio, 99 AD3d 19, 28 [1st Dept 2012], quoting Leibert v Clapp, 13 NY2d 313, 315-316 [1963]).
As explained by the Court of Appeals in Matter of Kemp & Beatley (Gardstein) (64 NY2d 63 [1984]), historically,
“[minority shareholders were granted standing in the absence of statutory authority to seek dissolution of corporations when controlling shareholders engaged in certain egregious conduct .... Predicated on the majority shareholders’ fiduciary obligation to treat all shareholders fairly and equally, to preserve corporate assets, and to fulfill their responsibilities of corporate management with ‘scrupulous good faith’, the courts’ equitable power can be invoked when ‘it appears that the directors and majority shareholders “have so palpably breached the fiduciary duty they owe to the minority shareholders that they are disqualified from exercising the exclusive discretion and the dissolution power given to them by statute” ’ ” (64 NY2d at 69-70 [citations omitted], quoting Leibert, at 317).
As the plaintiff has proved that the individual defendants have breached their duty to him as a minority shareholder by looting the corporation of its profits in violation of their fiduciary duty to the corporation, even going so far as to seek to compel his transfer to them of his entire interest for no more than his original investment, offering no consideration for the value of his share of the corporation, plaintiff has established his right to common-law dissolution.
Whether it is necessary to actually dissolve the corporation in order to redress plaintiffs grievances is, however, a matter to be considered independently once grounds for dissolution have been established (cf. Leibert, 13 NY2d at 318). Business Corporation Law § 1104-a (b) (1) directs the court, in analogous circumstances of a 20% shareholder action for dissolution based upon *700 grounds comparable to those established here, to consider “whether liquidation of the corporation is the only feasible means whereby the petitioners may reasonably expect to obtain a fair return on their investment.” Whereas judicial dissolution is an equitable remedy, the court has substantial discretion in determining the appropriate relief. In many situations, “a buyout of plaintiff’s interest for fair value ... is the more appropriate remedy” (Gjuraj v Uplift El. Corp., 110 AD3d 540, 542 [1st Dept 2013]; see also Mizrahi v Cohen, 104 AD3d 917, 920 [2d Dept 2013] [“in certain circumstances, a buyout may be an appropriate equitable remedy upon the dissolution of an LLC”]). In this case, in his sixth cause of action, plaintiff seeks just such relief and, in their dismissed third counterclaim, defendants sought to enforce a contract to purchase plaintiff’s shares, albeit not at fair value. Clearly, the parties do not wish to continue their association in this highly profitable business, but liquidation, in order to recompense plaintiff for the injustices visited upon him by defendants, is not warranted unless defendants fail to buy him out at fair value.[28]
Pursuant to Business Corporation Law § 1118, in a proceeding pursuant to Business Corporation Law § 1104-a, any shareholder, or the corporation itself, may elect to purchase the petitioner’s share in order to avoid dissolution and liquidation. Under the statute, upon such election, the dissolution proceeding is stayed so that the court may determine the fair value of the petitioner’s shares “as of the day prior to the date on which such petition was filed . . . giving effect to any adjustment or surcharge found to be appropriate . . . under section 1104-a” (Business Corporation Law § 1118 [b]). This rule appears to be equally applicable to common-law dissolution (see Robinson v Plaro Estates, Inc., 119 AD3d 542, 545 [2d Dept 2014]).
Two different methods for determining the value of the business were described in expert testimony at trial. Plaintiffs expert, Garibaldi, applied the net income method using his own projection of net income for the last full fiscal year of the corporation ending July 31, 2012, and multiplying by a factor of three and five to produce a range he testified is appropriate *701 based upon professionally-accepted standards.[29] Defendants’ expert, Cannon, based his determination of the value on the gross sales method and relied upon the information as reported by the restaurant’s accountant, Lipke. Cannon’s expert report noted that in order for his valuation to be accurate, he must have reliable data regarding the gross sales. As heretofore noted, since Lipke’s affidavit regarding gross sales for November 1, 2010 through October 31, 2013, upon which Cannon relied, is completely unreliable in that the restaurant received a large percentage of its revenue in unreported cash and Lipke’s report of revenue was premised entirely on Ramunni’s verbal undocumented representations of cash, Cannon’s valuation of the corporation is rejected as unreliable. Moreover, Cannon himself indicated that his conclusion was merely “phase one” of a more complex analysis that was never completed.
While the court finds Garibaldi’s valuation method to be more accurate in the circumstances, Garibaldi does not address whether the marketability of the plaintiffs shares affect their value. Cannon testified that minority shares in a restaurant that do not give decision-making authority to the holder, are significantly less marketable and require a discount of 35 to 50% in order to attract a buyer. The application of such a “minority discount” based on lack of control has been expressly rejected in this State (see Matter of Penepent Corp., 96 NY2d 186, 194 [2001]; Matter of Murphy v United States Dredging Corp., 74 AD3d 815, 818 [2d Dept 2010]), but the lack of general marketability of shares in a closely held corporation is recognized to be a factor to be considered in valuing such shares (see Murphy at 818 [approving a discount of 15% for lack of marketability]). As no evidence was offered as to a discount specifically applicable to plaintiffs shares in this, apparently highly profitable, closely held corporation, the court will apply only a 10% discount for lack of marketability (see Matter of Raskin v Walter Karl, Inc., 129 AD2d 642, 644 [2d Dept 1987]; Matter of Blake v Blake Agency, 107 AD2d 139, 149-150 [2d Dept 1985]).
*702 Unfortunately, neither expert offered an estimate of the corporation’s value on the valuation date, June 12, 2011, the date prior to the filing of the complaint (see Murphy at 817). It is therefore necessary to compute the value of the corporation on June 12, 2011, from the calculations supplied by Garibaldi of net income (profit) for the fiscal year 2010 ending July 31, 2011, as modified by eliminating the last two months and substituting the months of July and August from the prior year, so as to determine the net income for the year prior to commencement of suit. Using Garibaldi’s computations in which he deducted expenses, as reported in the tax return, from the estimated total revenue, as derived by applying the credit/cash ratio to the total credit deposits contained in the bank statements, a net income for the year of $1,072,059 is determined. In accord with Garibaldi’s testimony that the value of the business is equal to three to five times the net income for the preceding year, the court has multiplied $1,072,059 by 3,[30] to yield a base valuation of $3,216,177.
In Matter of Exterior Delite, Inc. (14 Misc 3d 910 [Sup Ct, Bronx County 2006]), in an action closely analogous to the case at bar in which claims of misappropriation of corporate funds were interposed in a proceeding seeking dissolution of the corporations pursuant to Business Corporation Law § 1104-a, the court rejected the finding of a referee that the evidence of diversion of assets should be disregarded in the valuation of the corporation for purposes of a buyout pursuant to Business Corporation Law § 1118, noting that “the alleged wrongdoing of misappropriation of corporate assets may play a role in the valuation determination [and is] relevant if [such misconduct] has had an adverse impact upon the corporation’s value” (id. at 915). The court relied upon the language of Business Corporation Law § 1104-a (d), authorizing an adjustment to stock value upon a finding of wilful or reckless dissipation of assets, and the language of Business Corporation Law § 1118, directing that any such finding be given effect in determining the value of shares, concluding that a derivative action for misappropriation of assets is “intertwined with the determination of ‘fair value’ of petitioner’s shares” (id. at 916, quoting Matter of Tosca Brick Oven Bread [Lubena], 243 AD2d 416, 416 [1st Dept 1997]; see also Matter of Gerzof v Coons, 168 AD2d 619, 620 [2d Dept 1990] *703 [finding the standard for determining fair value in the context of a Business Corporation Law § 1118 election is flexible and that misconduct that has had an adverse impact on the value of the corporation as an operating business may be considered]; Edmonds v Amnews Corp., 224 AD2d 358 [1st Dept 1996] [issues raised in derivative action may affect fair value and should be heard in tandem with dissolution]). This court concurs in the Exterior Delite court’s analysis and reasoning.
This court has determined that the individual defendants looted 3A North Park of cash over many years, depriving the corporation of its profits, and a judgment is to be entered for the sums diverted. That judgment is an asset of the corporation that should be added to the value calculated based upon the net income for a single year for the purpose of assessing the fair value of plaintiff’s shares. Accordingly, upon the addition of $4,957,511 (the judgment for 3A North Park), to $3,216,177, the court finds the fair value of 3A North Park on June 12, 2011, to be $8,173,688. Plaintiff’s 16.67% interest is, accordingly, valued at $1,362,554, less 10% as a discount for limited marketability ($136,255), for a total fair value of $1,226,299. As required by law, this sum, less a credit of $25,000 acknowledged to have been received by plaintiff in cash, shall accrue interest from June 12, 2011, to the date of payment, at the statutory rate of 9% per annum (see Matter of Blake, 107 AD2d at 150). As defendants have indicated an interest in buying plaintiffs shares to avoid dissolution, and such forced buyout appears to be the preferable alternative to dissolution (see Matter of Kemp & Beatley, 64 NY2d at 73-75; Gjuraj, 110 AD3d at 542; Mizrahi v Cohen, 104 AD3d 917, 920 [2d Dept 2013]; cf. Fedele v Seybert, 250 AD2d 519, 521 [1st Dept 1998], citing to the Business Corporation Law § 1104-a mandate to consider whether liquidation is “only feasible means” to protect the interest of petitioner), the purchase of plaintiffs shares at the above price shall be closed within 90 days hereof, or as agreed between the parties. However, upon notice to this court that no purchase is anticipated, dissolution will be granted and a liquidating trustee will be appointed by the court.
Constructive Trust
Plaintiff’s tenth cause of action seeks the imposition of a constructive trust, on behalf of the corporation, “over the money, property and assets of Ramunni and DeSimone and business entities to which they have diverted such funds.” “A constructive trust is an equitable remedy, and may be imposed *704 [w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest” (Rowe v Kingston, 94 AD3d 852, 853 [2d Dept 2012] [internal quotation marks and citation omitted]; see LMT Capital Mgt, LLC v Gerardi, 97 AD3d 546 [2d Dept 2012]). “The elements of a cause of action to impose a constructive trust are (1) the existence of a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment” (Quadrozzi v Estate of Quadrozzi, 99 AD3d 688, 691 [2d Dept 2012], citing Sharp v Kosmalski, 40 NY2d 119, 121 [1976]; Rowe, 94 AD3d at 853; Poupis v Brown, 90 AD3d 881, 882 [2d Dept 2011]). Although Ramunni and DeSimone are deemed to have had a fiduciary relationship to 3A North Park, there is no evidence of any specific promise made by them or of any reliance by the corporation thereon so as to justify imposition of a constructive trust. Moreover, no property was identified at trial that was purchased with diverted funds, nor was there any proof that other businesses owned by defendants were the recipient of the diverted funds (see Ali v Ahmad, 24 AD3d 475, 476 [2d Dept 2005]; Pizzurro v Pasquino, 201 AD2d 635, 636 [2d Dept 1994]). Plaintiff failed, therefore, to prove any basis to impose a constructive trust. Further, “[a]s an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate” (Bertoni v Catucci, 117 AD2d 892, 895 [3d Dept 1986]; Evans v Winston & Strawn, 303 AD2d 331, 333 [1st Dept 2003]). As plaintiff has not demonstrated that the legal remedy of a money judgment for damages will be inadequate, a constructive trust cannot be imposed over the assets of Ramunni and DeSimone (see id.). Accordingly, the tenth cause of action is dismissed.
Conclusion
Based upon Garibaldi’s valuation using the estimated net income for the year preceding the filing of the complaint, the court finds that the fair value of the corporation on June 12, 2011 is $8,173,688, inclusive of the corporation’s derivative judgment against the individual defendants. Taking into account the 10% discount for diminished marketability, this court values the plaintiffs interest in the corporation at $1,226,299. Deducting the $25,000 credit for prior cash payments to plaintiff, defendants are directed to buy out plaintiffs shares for $1,201,299, plus 9% interest from June 12, 2011 to the date of purchase, within 90 days of the date of this decision and or *705 der. The parties may extend the date of purchase, or modify the terms of sale, upon written stipulation signed by the parties personally, in addition to counsel, and filed with this court. It is further, ordered, that a judgment in the sum of $4,957,511 shall enter in favor of 3A North Park Avenue Restaurant Corp. against defendants Ramunni and DeSimone upon plaintiff’s eighth derivative cause of action. And it is further, ordered, plaintiffs third, fifth and tenth causes of action are dismissed. And it is further, ordered, that the proceeding for comm on-law dissolution, as alleged in the seventh cause of action, is stayed pending compliance with the above direction for a buyout. And it is further ordered, that the relief demanded in the sixth cause of action, seeking a purchase at fair value, is granted to the extent directed above.

. The agreement was executed by Ramunni as seller, without designation as an officer or representative of the corporation. The language referencing the seller’s “principals” suggests, however, that the corporation was meant to have the option to repurchase plaintiffs shares. The agreement also makes reference to the relationship of the parties as a partnership.

. Presumably, by tbis time, plaintiffs demands for an accounting were moot as discovery had been completed.

. Server reports are generated through a computerized ordering system in which the individual waiter or bartender inputs the data regarding the menu items purchased by each patron. Plaintiff called Tim Moran of Microsun Corporation, who has been employed by Cabo since January 2004 to provide the “point of sale” system designed “to assist restaurant owners to control their business and to just make sure that all the profits that they can get out of the business [are obtained]” (tr of May 13, 2014 at 23). Moran had visited Cabo approximately 50 times over the years. From the data entered by the individual server, the computer generates daily “server reports” for each server summarizing the amount and form of payment, whether cash or credit card, the tax and tips, and the amount of alcohol and food charges. In addition to server reports, the system is capable of generating other reports, including a breakdown of the specific food and drink items ordered so as to facilitate inventory monitoring and purchasing. Mr. Moran testified that the data is normally stored, and is retrievable, for one year (365 days) and cannot be altered or amended. It is inconceivable that the individual defendants, experienced restauranteurs, were unaware of the significance of the server reports and did not recognize that they constituted electronically stored information called for in the document demands.

. Other testimony and the records indicate that the restaurant commenced doing business in November 2003.

. The collection of server reports was incomplete, even for this limited time period. According to plaintiffs counsel, and uncontested by the defendants, two months of reports were missing and, in any given month, reports from certain days were missing.

. Each server report contains numerous pieces of information about the server’s shift including, for example, a break down of the number of guests, checks, types of credit cards, and the amount of cash designated as server tips.

. There was no evidence of the fees deducted from the deposit of credit card charges, but, if anything, such deductions would reduce the total amount of such deposits such that the total amount of cash projected based on the ratio of credit to cash would be reduced.

. Some of the charts contained within the plaintiffs expert report were actually created within plaintiffs counsel’s office, but Garibaldi testified that he had personally verified all of the entries from the documents in his possession and the court admitted the report over defendants’ objection.

. The server reports do not identify what percentage of a customer’s credit card payment was intended as a tip. Garibaldi assumed an 18% tip level, instead of the “conventional 1S%” noting that he believed this to be a conservative estimate that effectively lowered the estimate of the corporation’s profits.

. Of the 11 days, there were two Sundays, one Monday, three Tuesdays, two Wednesdays, one Friday, and two Saturdays. One of the Tuesdays was Valentine’s Day and another Tuesday was Eid al-Fitr, an Islamic holiday.

. If a judgment against the corporation of $1,692,263 (inclusive of interest at 9%) were awarded in plaintiffs favor for lost profits, creating a liability of the corporation, Garibaldi estimated the value of the business to be between $1,586,881 and $3,772,997, reducing plaintiffs 16.67% interest in the corporation to between $264,533 and $628,955.

. Cannon’s report makes reference to several documents he used in formulating his opinion as to the value of Cabo as a business, including the *681 sales summary, but defendants did not provide these documents in their trial exhibits even though they were part of the defendants’ expert report. However, plaintiff did supply these documents in his trial binder of exhibits and did not oppose the admission into evidence of the defendants’ expert report.

. Twelve times $202,421.70 equals $2,429,060.40.

. There has been no testimony or allegation that the corporation’s expenses were underreported. Defendants stipulated that the expenses reported in the tax returns for 3A North Park were accurate and offered no evidence of actual expenses to controvert the records relied upon by Garibaldi.

. Garibaldi’s expert report also contains an analysis of projected revenue calculated on a rent-based formula, as applied by the New York State Department *684 of Taxation. The general formula assumes the average restaurant spends 8.5% of its revenue on rent and calculates sales by multiplying the rent by a factor of 11.76. Garibaldi rejected the reliability of applying this formula to Cabo because Cabo is open longer hours than most restaurants, offers takeout, has two bars in which sales per unit area and per dollar in rent are higher and has a “second life” as a nightclub on Fridays and Saturdays. A review of the server reports introduced at trial reveals that on Friday and Saturday, days with particularly high cash to credit card ratios, the cash sales were predominantly for alcohol in shifts ending after 3 a.m. It is noted that the server reports for such shifts also reveal higher overall total sales than on weekdays, thus corroborating Garibaldi’s explanation as to why Cabo’s credit/ cash ratio may be atypical for a restaurant.

. In his report, Cannon listed authorities that had been supplied to him by his staff “that spoke towards evaluating of a restaurant.” Cannon testified that he was otherwise unfamiliar with the sources and had “considered” them but did not “necessarily use all of the pieces of them” (tr of June 3, 2014 at 27).

. Cannon testified that, in order to obtain verification of his assessment, he had “reached out” to business brokers in New York State and had provided to Kenneth Lief, a business broker located in Valley Stream, Long Island, the same data he had used without identifying the name of the restaurant. According to Cannon, Lief gave a value of $460,000. Although the court appreciates Cannon’s candor in acknowledging his own limitations, such hearsay testimony is neither admissible nor probative and is disregarded by this court.

. It is noted that, other than the parties to the action, no independent witness was produced to corroborate any of defendants’ accusations that plaintiff was “falling down drunk” on the premises or that customers had complained, indicating that they would no longer patronize the restaurant.

. The server reports, introduced into evidence, included three dates after a fire occurred in the kitchen of the restaurant. According to the testimony at trial, business was dramatically reduced in the months immediately following the fire while repairs were being made. Those dates were therefore not included in making this comparison.

. In this court’s summary judgment decision in this action, it was noted that the New York State Department of Taxation and Finance concluded that the corporation understated its revenues by $755,600.23 for the period from June 2006 to February 2009 (Cortes v 3A North Park Ave. Rest. Corp., Sup Ct, Kings County, June 28, 2013, Demarest, J., index No. 013396/2011).

. Ramunni testified that the estimated server tip rate at the restaurant was closer to 15%. As noted, supra, Garibaldi’s use of 18% would only reduce the amount of projected cash diversion, to defendants’ benefit.

. In fact, when the total yearly payments by checks are computed from the bank statements for the fiscal years ending in 2009 and 2010, the total sum of expenses actually exceed the total expenses reported in the financial statements for those years.

. It is further noted that Garibaldi’s “adjustment” of the credit card deposits, by deducting the taxes and 18% for tips, also had the effect of deflating the basis for determining the amount of cash actually received using the credit/cash ratio.

. Collins v Telcoa Intl. Corp. (283 AD2d 128 [2d Dept 2001]), cited by plaintiff, is distinguishable from the situation at bar in that, in Collins, the controlling shareholders sold substantially all of the assets of the corporation over the 5% shareholder’s objection and without giving him proper statutory notice, in breach of their fiduciary duty owed directly to the plaintiff. The court found that because, rather than seeking appraisal of his shares pursuant to Business Corporation Law § 623, plaintiff sought common-law dissolution for defendants’ acts of oppressive conduct in diluting the value of his shares and absconding with plaintiffs share of the profits from the sale of the assets, plaintiff was entitled to seek damages directly from the defendants for their breach of duty to him personally. Losses to the corporation were not at issue.

. The total sales projected by Garibaldi, from 2003 through the period of the June 2011 bank statement (ending June 8, 2011), was $11,246,703.23 after adjusting for tips and taxes. The total actual deposits as reflected in all the bank statements for the same period, as reported in the plaintiffs expert report, was $7,527,296.

. November 2003 is the first month with reported revenue for the corporation and the complaint was filed on June 13, 2011. While Garibaldi calculated the sums diverted through 2013, and there is some probability that cash continued to be diverted after this action was commenced, the sales summary provided for the end of December 2012 into January 2013 is likely to accurately reflect revenues for that period and it is improbable that defendants would have continued to divert cash in the magnitude of the sums projected by Garibaldi once litigation became active and plaintiff had access to the server reports. Moreover, the probability of recovery of the diverted sums from *698 defendants, by the corporation, now to be exclusively controlled by defendants, is remote at best. The court has, therefore, determined, in its discretion, to award interest only from October 1, 2007, upon damages sustained through June 12, 2011.

. The yearly interest on the diverted revenue is $334,746.65 ($3,719,407.23 x 9%). That interest is divided by 365 days to determine that the daily interest is $917.11. This is multiplied by 1,350 days, the duration of time between October 1, 2007 and June 12, 2011, and this equals $1,238,104.05.

. It is noted that both plaintiff and defendants agree that, should the court find grounds to order dissolution analogous to the standard set forth in Business Corporation Law § 1104-a, Business Corporation Law § 1118 should also be implemented to permit a buyout of the minority interest.

. Garibaldi used his credit/cash ratio-based projection of actual revenue to estimate the recovery to which plaintiff would be entitled if he were granted judgment on his personal claims for a share of the profits over the nine years he bas owned his shares. Thus, he calculated net profit for each year, took 16.67% representing plaintiffs interest, and calculated interest through 2013. The court has not adopted such figures in light of the dismissal of the third and seventh causes of action seeking direct personal recovery of a share of projected profits.

. The court has chosen to use the lower multiple here to compensate for the addition of the judgment awarded to 3A North Park, which includes the projected diverted funds for the same period of time.