Nissim Kassab, Petitioner,

against
Avraham Kasab, Mall 92-30 Associates LLC, and Corner 160 Associates, Inc., Defendants.

Avraham Kasab, Plaintiff,
against
Nissim Kasab, Defendant.

711061/15

For Petitioner: Shlam, Stone & Dolan, LLP. 
For Respondent: McLaughlin & Stern, LLP., John M. Brickman, Esq.


Timothy J. Dufficy, J.

DECISION AFTER TRIAL
A joint trial was held before this Court, on March 20, 2017, March 21, 2017, March 22, 2017, March 27, 2017, March 29, 2017, March 30, 2017, April 18, 2017, and May 16, 2017. Thereafter, the parties were given, until June 30, 2017, to submit post-trial findings of fact and [*2]conclusions of law. As this was a bench trial, the Court was both the finder of facts and the determiner of questions of law. The Court considered the testimony of the witnesses, gave weight to that testimony, and generally determined the reliability of the witnesses' testimony (See Horsford v Bacott, 32 AD3d 310, 312 [1st Dept. 2006]). The Court also considered the interest or lack of interest in the case and the bias or prejudice of the witnesses (See People v Ferguson, 178 AD2d 149 [1st Dept. 1991). The Court declined to apply the maxim of falsus in uno, falsus in omnibus. Accordingly, the Court made credibility determinations on a case-by-case basis, wherever necessary and appropriate to do so (see Noryb Ventures, Inc. v Mankovsky, 47 Misc 3d 1220(A), 1220A [Sup. Ct. NY Co. 2015]). The parties agreed that the depositions of witnesses were admissible at trial as if the testimony was given from the witness stand. Having reviewed the parties' submissions and having reflected upon the evidence submitted at trial, the Court renders the following Findings of Fact and Conclusions of Law.
Prior Procedural History [FN1]
The Appellate Division, Second Department, reviewed the determination of the previous motions in this case, which were decided by Justice Kitzes before his retirement (see Matter of Kassab v Kassab, 137 AD3d 1135, 1136 [2d Dept. 2016].) There were three related appeals. The petitioner appealed from Justice Kitzes' March 12, 2014 Order, which granted those branches of the respondent's motion, pursuant to CPLR 3211(a), to dismiss the second, third, and seventh causes of action in the petition. It held that the petitioner failed to state a cause of action for judicial dissolution of Mall 92-30 Associates LLC (LLC), pursuant to Limited Liability Company Law § 702, based on his allegations of oppressive conduct and the respondent's efforts to exclude him from the management of the LLC. Accordingly the second cause of action, which sought the judicial dissolution of the LLC, for failure to state a cause of action was properly [*3]dismissed. Justice Kitzes properly directed the dismissal of the third cause of action, since the petitioner failed to state a cause of action for withdrawal from the LLC, pursuant to Limited Liability Company Law § 606(a). Furthermore, the Supreme Court properly determined that the seventh cause of action, which sought declaratory relief, was time-barred.
In April 2014, the petitioner filed an amended petition/complaint, adding an eighth cause of action, which was for an "equitable buyout" of his interest in the LLC, a ninth cause of action, which was for rescission of the LLC's operating agreement, and a tenth cause of action, which was, inter alia, to recover damages for breach of fiduciary duty, to remove the respondent from managing the LLC and Corner 160 Associates, Inc. (Corner), a corporation in which the petitioner and the respondent were the sole shareholders, and to compel the sale of property owned by the LLC and Corner. The respondent moved, inter alia, pursuant to CPLR 3211(a)(7), to dismiss the eighth, ninth, and tenth causes of action in the amended petition/complaint. In an Order, dated February 10, 2015, Justice Kitzes, among other things, granted those branches of the motion. The petitioner appealed. (See Matter of Kassab v Kassab, 137 AD3d 1138, 1139 [2d Dept 2016].)
The Appellate Division, Second Department, affirmed Justice Kitzes Order. It held that "in certain circumstances, a buyout may be an appropriate equitable remedy upon the dissolution of an LLC" but since this Court has determined, in a companion appeal, that the petitioner failed to state a cause of action for the judicial dissolution of the LLC, pursuant to Limited Liability Company Law § 702, there is no basis to invoke the equitable remedy of a buyout." Accordingly, Justice Kitzes properly granted that branch of the respondent's motion which was to dismiss the eighth cause of action for failure to state a cause of action. Additionally, Justice Kitzes properly determined that the petitioner failed to state a cause of action for rescission of the LLC's operating agreement. The Second Department found that Justice Kitzes properly granted that branch of the respondent's motion, which was to dismiss the ninth and tenth causes of action for breach of fiduciary duty, for failure to state a cause of action. (Matter of Kassab v Kassab, supra at 1140). It found that the petitioner failed to allege any basis to remove the respondent from the management of the LLC and Corner, or to compel the sale of property owned by those entities in the absence of the dissolution of those entities. (See Matter of Kassab v Kassab, supra at 1140-1141).
The third appeal, from an Order, dated February 5, 2015 (Kitzes, J.), that granted those branches of the petitioner's motion, which were to hold the respondent Avraham Kassab in civil contempt for violation of an order of the same court, dated July 30, 2013, and for attorneys' fee and the imposition of a fine, and an order of the same court, dated April 15, 2015, which, inter alia, imposed a fine upon the respondent Avraham Kassab, in the sum of $250, and directed him to pay the petitioner attorneys' fees and costs, in the sum of $25,045, was also affirmed (see Matter of Kassab v Kassab, 137 AD3d 1141 [2d Dept 2016].) On that matter, the Appellate Division, Second Department, specifically held as follows:
Here, the petitioner established, by clear and convincing evidence, that the respondent disobeyed a lawful order of the Supreme Court, clearly expressing an unequivocal mandate, with knowledge of its terms, by using funds belonging to Corner to pay his legal fees in this hybrid proceeding and action (see Matter of Burke v Erle, 125 AD3d 773, 999 NYS2d 900 [2015]; Matter of Milazzo v Hamerschlag, 102 AD3d 615, 959 [*4]NYS2d 152 [2013]), and that the petitioner was prejudiced by the offending conduct (see Matter of Executive Life Ins. Co. of NY, 122 AD3d 629, 630, 996 NYS2d 123 [2014]). Further, contrary to the appellants' contention, legal fees incurred by a shareholder in defending a dissolution proceeding are not payable with corporate funds as expenses incurred in the ordinary course of business (see Matter of Boucher v Carriage House Realty Corp., 105 AD3d 951, 962 NYS2d 718 [2013]; Matter of Park Inn Ford, 249 AD2d 307, 671 NYS2d 288 [1998]; Matter of Penepent Corp.,198 AD2d 782, 605 NYS2d 691 [1993]; Matter of Public Relations Aids, 109 AD2d 502, 511, 492 NYS2d 736 [1985]; Matter of Reinschreiber [Lipp], 70 AD2d 596, 416 NYS2d 31 [1979]). Accordingly, the Supreme Court providently exercised its discretion in granting that branch of the petitioner's motion which was to hold the respondent in civil contempt.
(Matter of Kassab v Kassab, supra at 1142; emphasis supplied.)
FINDINGS OF FACT
The Companies
Nissim Kassab and his brother, Avraham Kasab, jointly owned two entities, Corner 160 Associates, Inc. (Corner), and Mall 92-30 Associates LLC (Mall). Both Corner and Mall are real-estate holding companies. Together, the entities owned three adjacent, unimproved parcels of land in Jamaica, Queens. Corner owns Lots 79 and 130 of Block 10101, and Mall owns Lot 24 of the same block. Corner was incorporated in 1992. It has no shareholders agreement, and no bylaws. The brothers jointly incorporated Corner, and purchased the first property lot in Corner's name. They made the purchase with their joint money, as a joint investment. They subsequently bought a second plot in Corner's name. Corner was originally incorporated only in Nissim's name, because Avraham had marital problems and wanted to hide his interest in Corner from his wife. However, in order to retain his control of Corner, Avraham prepared an option agreement which gave him the right to buy 75% of the stock in Corner for $25,000 at any time within the next ten (10) years. In 2002, Avraham exercised the option and became a 75% shareholder in Corner.
Mall was formed in 2001. The brothers were the original members of Mall. Nissim invested 25% in Mall, and Avraham invested 75% of the funds in Mall. Mall purchased a lot adjacent to the two lots owned by Corner. Mall has an operating agreement, dated March 13, 2001, signed by both brothers. The agreement lists the brothers as the two members of Mall, along with their respective percentage of ownership (Avraham 75% and Nissim 25%). Section 5 of the operating agreement provides that "the business and affairs of the Company shall be managed by the Members."
When the properties were purchased, there were two buildings comprising retail stores on the land owned by Corner and Mall. On or about 2010, the brothers decided to demolish the buildings, and within the next two years they were demolished. Hence, there were no buildings in the land owned by either Corner or Mall. To fund the demolition, both brothers made investments into the business in approximate proportion to their ownership interest. Nissim's contribution was derived from the sale proceeds of the sale of a house in Brooklyn which the brothers owned. The brothers intended to hold the properties on a long-term basis, in order to develop the properties jointly when market conditions permitted.
Following the demolition of the buildings, the brothers operated a parking lot, as well as a [*5]flea market, on the three lots. Nissim took the primary role managing the properties on a day-to-day basis. The business is operated as a single entity on all three of the lots, owned by Corner and Mall, and goes by the name of Safe Parking. Mall is licensed by New York City to operate a parking lot. There is no access from the street directly to the property of Mall. The parking lot and the flea market are the only sources of income for Corner and Mall. The parking lot is a cash business. As it accepts cash only, no credit or debit cards are accepted as payment for parking. The parking lot is open five days a week, all year round except for snow days. The flea market operates on weekends during good weather, primarily during spring, summer and fall, and is also a cash business only. The property can accommodate 130 or 140 cars.
Nissim's Money Troubles
In the past, the brothers had trusted one another, operated their businesses together as partners, and managed everything jointly. They divided their profits and split them. Apparently, the retail store closings resulted in a significant loss of income for Nissim. From time to time, Nissim told Avraham that he was in need of money, and Avraham agreed to lend him funds. Moreover, Avraham and Nissim discussed the possibility that Avraham could purchase Nissim's interests in the companies. At some point, Nissim's home went into foreclosure, he had no remaining liquidity, and needed cash. Nissim had five children in private school, which cost him approximately $80,000 per year for tuition. Nissim also owed Harrah's Casino, in Atlantic City, New Jersey, nearly $30,000 for gambling debts. Harrah's filed a lawsuit against Nissim to collect the outstanding gambling debts.
As a result of Nissim's lifestyle choices and corresponding need for money, the brothers decided to sell a two-family home in Brooklyn that they owned in equal shares. The money was used to demolish the buildings on the Jamaica lots, and create a parking lot operated by Mall on the properties. When this proved insufficient to cover his needs, Nissim began stealing cash from the parking lot and flea market business receipts that was part of the corporation's receivables. This began, on or about November, 2011, and continued through February, 2013. The total amount misappropriated by Nissim was approximately $121,000. In 2011 and 2012, Avraham lent Nissim $30,000. Nissim failed to pay the rent on and off-site office that the brothers had leased on Jamaica Avenue and Union Mall Street.
On August 27, 2012, Nissim signed two promissory notes payable to Avraham, one in the principal amount of $355,000 and the other for $100,000. On or about the same date, Nissim also signed two pledge agreements, using his shares in the corporations as collateral to secure the payment of the notes. The $355,000 note provides for interest at 4.35%, from August 27, 2012, until the maturity date. The pledge agreement associated with the $355,000 note provides that Avraham may, at any time, in his sole discretion, change the time of payment and the terms of payment and performance of any of the obligations of Nissim as borrower under the note. The $100,000 note provides that the interest rate from the date of the note to maturity shall be 0%. The $100,000 note replaced an earlier "IOU" that Nissim had signed. The principal of the $100,000 note was related to the sale of the two-family home, representing Avraham's share of the proceeds of the sale of that home. The pledge agreement associated with the $100,000 note provides, that Avraham may accelerate the date of payment and change the terms of performance. When he signed the $355,000 note, Nissim apparently agreed that Avraham was entitled to $75,000 of the amount of money that he had taken out of the corporation. The $355,000 note was [*6]intended, among other things, to account for, and to repay Avraham for his 75% share of the cash receipts that Nissim had taken from the parking lot, and that this would be payable to him personally, rather than to the corporation, in lieu of a distribution. At his deposition, Nissim admitted that he had borrowed $355,000 from Avraham, and that he had not repaid it. He confirmed this answer at trial. Nissim further admitted that he had borrowed $100,000, and not repaid it. At the time that he signed the two notes, Nissim was represented by counsel. At this point in their relationship, the brothers had two competing, diverse objectives for the use of the property, and could not agree. Their lifestyles were different, Avraham had money from other businesses, while Nissim did not.
Distributions
The parties entered into an agreement, dated August 27, 2012, under which Avraham was to make distributions of net income from Corner and Mall of 40% of the net income of Corner and Mall, after operating expenses to Nissim, with Avraham receiving the balance. The agreement reflected the work that Nissim had done managing the property over the years.
For the years 2012, 2013, 2014, and 2015, the companies provided health insurance for Nissim and his family, paying the $2,000 monthly premiums for the insurance. The companies also paid health insurance premiums for Avraham and his family. Nissim's contention that his family's health insurance was canceled is unsupported by the evidence. The companies did not treat the health insurance premiums as company expenses for financial reporting and income- tax purposes. As it happened, 40% of the net income of the companies, for the years 2013, 2014, and 2015, amounted to less than the premiums for medical insurance for Nissim and his family. In 2013, Corner reported net rental real estate losses of $28,750 and no other income. In 2013, Mall reported net rental real estate income of $35,593, and no other income. The aggregate net income for Corner and Mall in 2013 was $6,878 and in 2014, Corner reported net rental real estate losses of $71,508, and no other income. In 2014, Mall reported net rental real estate losses of $9,680, and no other income. In 2014, in the aggregate, Corner and Mall lost money and had no net income. Although in 2013, in the aggregate, Corner and Mall had modest net income of $6,870, and in 2014, in the aggregate, Corner and Mall had net losses of $81,188, each year the companies paid health insurance premiums for Nissim and his family. In 2015, Mall reported net real estate rental losses of $92, and no other income. In 2015, in the aggregate, Corner and Mall had net income of $63,896. The respondent demonstrated that 40% of that amount, or $25,558, was essentially equivalent to the $2,000 per month ($24,000 per year) payments that the companies paid for health insurance premiums for Nissim and his family. Thus, Nissim's statement that he received no distributions from the companies does not reflect the amounts of health insurance premiums paid by the companies, irrespective of whether or not they generated profits during the fiscal year.
Parting of the Ways
The Court finds, that on March 4, 2013, Avraham told Nissim to get out of the office trailer in the parking lot due to his having diverted money from the gross receipts of the business to meet his financial needs. Nissim left the business at that point and did not return when Avraham was present. He was never formally removed from any management position of Corner. At Avraham's request, on May 5, 2013, Nissim met with Joseph Dana, Avraham's wife's father, to attempt to seek a peaceful solution to Nissim's threat of litigation. Nothing was [*7]resolved.
Unilateral Decision Making by Avraham
Concurrent with Nissim's need for money to pay for his lifestyle was his brother Avraham's intractability and despotic decision-making practices with respect to considering other options for the disposition of the real estate holdings of their corporation. On or about November 16, 2015, Nissim received an offer from a potential buyer to purchase the three lots owned by Corner and Mall for $28 million. He received that offer through a real-estate broker who found his name in the New York City Building Department records. He communicated this offer to Avraham through his attorneys. Avraham received the offer, did not consult Nissim about it, and unilaterally rejected the offer. There was also an offer from the owner of a neighboring property to lease a small portion, about 10%, of the property owned by Corner for about a year at $60,000 per month in order to house a crane and other construction equipment. On or about October 21, 2015, Nissim communicated the offer through his attorneys to Avraham, attaching a draft licensing agreement. Again, Avraham never discussed the deal with Nissim. Because Avraham delayed in responding to the offer, and the deal was time sensitive, the deal was lost. Several months later, in April, 2016, the same adjacent property owner contacted Nissim with a similar offer to rent a small part of Corner's property for a few months, at $50,000 per month, to finish the construction project on his own property. Nissim's attorneys once again conveyed the offer to Avraham's attorneys and requested that Avraham either negotiate the deal directly with the property owner or authorize Nissim to do so. Avraham never discussed the offer with Nissim and unilaterally decided not to pursue the deal. The Court does not credit Avraham's testimony regarding his reasons for not pursuing the deal with the adjacent property owner. Similarly, a new parking lot attendant and new accountant were hired for the business without consulting Nissim. The Court does not credit Avraham's claim that he could not communicate with Nissim because he could not find him. The evidence indicates that Avraham failed to keep Nissim involved in major decisions concerning the business of Corner and Mall.
Under-reporting of Income
On March 1, 2017, March 6, 2017 and March 7, 2017, an investigator named John Downey, a former police officer, conducted surveillance of the parking lot over a 12-hour period on each of the three days. He kept count of the number of vehicles that enter the parking lot throughout the day, until the parking lot closed at around 7 p.m. On the first day, he observed 102 vehicles enter the parking lot. On the second, day, he observed 128 vehicles enter the parking lot. On the third day, he observed 124 vehicles enter the parking lot. Each day more than 100 vehicles entered the lot. By comparison, the ledger that was kept by the respondent for the same days listed 76 cars, 82 cars and 81 cars, respectively. The respondent offered no plausible explanation for the inconsistency between the investigators observations and the records he kept. There was no accounting of how many of the vehicles were monthly customers. The foregoing evidence raises a strong inference that the respondent under-reported the number of vehicles utilizing the parking lot, and consequently, the amount of income the lot produced. There was evidence that the income from the flea market may have been under-reported as well since no accurate records existed or were produced at trial.
Valuation Testimony
Three expert reports were stipulated to be admissible at trial: Henry Salmon, Andrew [*8]Albro, and Z. Christopher Mercer.
Mr. Salmon, called on behalf of Nissim, has testified as an expert over 50 times, providing real estate appraisals to New York state and federal courts. He appraised the market value of the lots, owned by Corner and Mall, using the direct sales comparison approach, which is based on analysis of the selling prices of similar properties. Vacant land is appraised based on buildable square footage, which is determined by the square footage of the land multiplied by the applicable floor-area-ratio as permitted by the applicable zoning. The C6-3 zoning designation has a commercial floor area ratio of 6.0 and a residential floor area ratio of 7.52, which may be increased by a 20% bonus for a public plaza or inclusionary housing. Since each parcel owned by Corner and Mall has sufficient area for a public plaza or inclusionary housing, Mr. Salmon found that the subject property has the potential for a floor area ratio of 9.0. He determined the buildable square footage of each lot by multiplying the basic square footage of each parcel by the floor area ratio of 9. He also applied the 20% inclusionary housing bonus, which was applicable. As a result, Mr. Salmon determined the fair market value of each of the three lots as of May 7, 2013, the day before the dissolution action was commenced, to be $10,020,000 for Lot 79, owned by Corner; $3,525,000 for Lot 150 owned by Corner; and $7,315,000 for Lot 24, owned by Mall. Based on other comparable sales closer in time, Mr. Salmon determined the fair market value of each of the three lots, as of June 20, 2016, the date of his physical inspection of the property, to be $11,840,000 for Lot 79, owned by Corner; $4,165,000 for Lot 150, owned by Corner; and $8,645,000 for Lot 24, owned by Mall.
Mr. Albro, whose report was provided on behalf of Avraham, appraised the combined fair market value of the two lots owned by Corner, as of April 6, 2017, at $16,450,000. The Albro report did not address the value of the lot owned by Mall, nor did it address the value of the property as of any of the other valuation dates. Mr. Albro also utilized the direct-sales comparison approach to determine property values. He also analyzed comparable sales in terms of value per buildable square foot. There is little variation between the current valuations for the properties owned by Corner between the Salmon and Albro reports. Mr. Albro appraised the value of Corner's property, in April 2017, at $80 per buildable square foot, and Mr. Salmon appraised the same property, at $55 per buildable square foot, in 2013, and $65 per buildable square foot, in 2016.
Mr. Mercer, a business valuation expert, has extensive experience in statutory fair value cases. He is an expert on marketability discounts. The Mercer report determined the fair value of Nissim's interest in each of the two companies, as of May 7, 2013, or alternatively, as of July 29, 2013. He utilized the net-asset-value method, which he considered the most appropriate for evaluation of companies that hold and manage real estate assets. In order to perform his valuation, he relied on the property appraisals in the Salmon report, making adjustments for additional assets and liabilities of the companies reflected in their books and records. After adjusting the value of the property owned by Corner as determined in the Salmon report, to reflect other contemporaneous assets and liabilities of Corner, based on the records provided by Avraham, he determined the net asset value of Corner, as of May 7, 2013, to be $12,680,691. Similarly, he found the net asset value of Mall, as of May 7, 2013, to be $6,665,829.
In determining the fair value of Nissim's interest in each of the companies, Mr. Mercer did not apply any marketability discount, since the companies were real-estate holding [*9]companies, whose valuation already relies upon market exposure. As a result of Mr. Mercer's calculations, Nissim's 25% interest in Corner, as of May 7, 2013, is $3,170,173, and his 25% interest in Mall, as of May 7, 2013, is $1,666,457. Since the respondent did not proffer any competing valuation to controvert that of Mr. Mercer, the Court will accept the values listed in the Mercer report. Consequently, this Court finds that the fair value of the petitioner's shares in Corner, as of May 7, 2013, is $3,170,173.
CONCLUSIONS OF LAW
Breach of Fiduciary Duty
The Court of Appeals has recognized that a shareholder may sue in his individual capacity for a wrong against the corporation where (1) the petitioner sustained a loss disproportionate to that sustained by the corporation; (2) the respondent breached a duty to the petitioner independent of any duty owed to the corporation; or (3) the petitioner will be unable to enforce his contractual rights against the corporation in the event that the corporation is made whole through a derivative action. (See Abrams v Donati, 66 NY2d 951, 953 [1985]; see also Rutigliano v Locantro, 2017 NY Slip Op 30446[U], *16-17 [Sup. Ct., NY Co. 2017].) A corporate shareholder may bring a direct (as opposed to derivative) action for harm suffered to the shareholder individually where "he or she can prevail without showing an injury to the corporation." (Yudell v. Gilbert, 99 AD3d 108, 114 [1st Dept. 2012]). A dissolution claim may be joined with non-dissolution claims; "there is no bar to a shareholder pursuing both dissolution and derivative actions simultaneously" (Slade v Endervelt, 174 AD2d 389 [1st Dept. 1991]; see also Matter of Tosca Brick Oven Bread [Lubena], 243 AD2d 416 [1st Dept. 1997]). Moreover, since the resolution of the non-dissolution claims may affect the "fair value" to be determined in valuing petitioner's shares in the event that respondent exercises his rights under Business Corporation §1118, such non-dissolution claims, and valuation proceeding are "inextricably intertwined," and are appropriately ordered to proceed in tandem before the same court," (Matter of Piazza v Gioia, 2016 NY Slip Op 31430[U], *31-32 [Sup. Ct., Kings Co. 2016].)
To plead a breach of fiduciary duty, the petitioner must allege: (1) respondent owed a fiduciary duty; (2) the respondent committed misconduct; and (3) the petitioner suffered damages caused by that misconduct (Burry, et al. v Madison Park Owner LLC, 84 AD3d 699, 699-700 [1st Dept. 2011]); Moffatt v JPMorgan Chase Bank, 2012 NY Misc. LEXIS 6240, *19-20, 2012 NY Slip Op 33274(U), 17 [Sup Ct. NY Co. 2012] affirmed 110 AD3d 431 [1st Dept. 2013]). "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." ( Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 561 [2009] quoting EBC I v Goldman Sachs & Co., 5 NY3d 11,19 [2005]). This relationship is grounded on a "higher trust" than normally present in the marketplace between those involved in arm's length business transactions (see HF Mgmt. Servs., LLC v Pistone, 34 AD3d 82, 85 [1st Dept. 2006]).
The "relationship between shareholders in a close corporation, vis-a-vis each other, is akin to that between partners and imposes a high degree of fidelity and good faith" (Brunetti v Musallam, 11 AD3d 280, 281[1st Dept. 2004] quoting Fender v Prescott, 101 AD2d 418 [1st Dept. 1984] affirmed 64 NY2d 1077,1079 [1985]). This "strict standard of good faith imposed upon a fiduciary may not be so easily circumvented" (id. at 423). 
As the petitioner is a minority shareholder, he is owed a fiduciary duty by the individual [*10]majority shareholder respondent/respondent to scrupulously guard the assets of the corporation and honestly account to petitioner for the application thereof. Upon review of the testimony and documents introduced into evidence, the Court finds that the preponderance of evidence established that Avraham had control over the corporation's decision-making process, and excluded Kissim from that process after he learned that Kissim was misappropriating the corporation's gross receipts for his own use. The latter cannot constitute the basis for a breach of fiduciary duty, since it was occasioned by Kissim's own misconduct. However, Avraham under-reported the amount of cars that were being parked in the parking lot, and thereby breached his fiduciary duty to Nissim as a shareholder to faithfully record the proceeds of the parking-lot business. It appears that significant sums of unreported cash were diverted from the corporation by both shareholders/brothers. Since the parties' payments to themselves were unauthorized, as a matter of law, they are mutually liable for breach of fiduciary duty (see SantiEsteban v Crowder, 92 AD3d 544, 546 [1st Dept. 2012].)
Under the circumstances, in the interest of justice, it would be inequitable to award any damages under this theory. To do so would require this Court to determine which party's acts of waste were more culpable.
Common-Law Dissolution
In New York, the right to dissolution for a shareholder who is at odds with fellow shareholders is available at common law and by statute. Because the statutory right may result in a compelled buyout of the dissident's share, some litigants prefer to rely on common law.
Under New York law, a minority shareholder may obtain dissolution where the controlling shareholders have engaged in egregious conduct, including having "palpably breached the fiduciary duty they owe to the minority shareholders." (Liebert v Clapp, 13 NY2d 313, 317 [1963]; Fedele v Seybert, 250 AD2d 519, 521 [1st Dept. 1998]). The remedy of common law dissolution is reserved for egregious conduct (see Matter of Kemp v Beatley, Inc., 64 NY2d 63, 69—70 [1984]; In re Quall Aero Serv., Inc., 300 AD2d 800, 802 [3d Dept. 2002]; Cortes v 3A N. Park Ave Rest Corp., 46 Misc 3d 670 [Sup. Ct. Kings Co. 2014]). For example, the control shareholder's decision to continue with the enterprise and not buy out the minority, even though the absence of a buy-out causes financial hardship for the minority, is insufficient grounds for dissolution at common law (see Application of Dubonnet Scarfs, Inc.,105 AD2d 339, 343 [1st Dept. 1985]).
In contrast to statutory dissolution, the petitioner need not satisfy a minimum share ownership requirement seeking dissolution at common law. Because the remedy is equitable in nature, the larger the shareholding, the more readily the court will be prepared to take the drastic step of dissolution.
Statutory Dissolution
Business Corporation Law § 1104-a (a) authorizes a minority shareholder with at least 20% of the voting interest in a corporation to petition for judicial dissolution on one or more of the following grounds: (1)The directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders; (2)The property or assets of the corporation are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation. (See Matter of Digeser v Flach, 49 Misc 3d 1213[A], 2015 NY Slip Op 51609[U], *3 [Sup. Ct., Albany Co. 2015].) "Waste" refers to the [*11]"misappropriation of corporate assets for private purpose" (see Cunningham v 344 6th Ave Owners Corp., 256 AD2d 406, 407 [2d Dept 1998]; see also Matter of Borriello v Jersey Lynne Farms, Inc., 2017 NY Slip Op 31077[U], *4-5 [Sup. Ct., Kings Co. 2017].) A corporation's lack of profitability does not constitute "waste" for purposes of BCL §1104-a.
Statutory dissolution under Section 1104-a may be obtained upon a showing of "illegal" or "fraudulent" acts by the directors or those in control of the corporation (see NY Bus. Corp. Law § 1104-a [a][1] [2011]). In construing BCL 1104-a, courts give the terms "illegal" and "fraudulent" their common meaning (see Cunningham v 344 6th Ave Owners Corp., supra at 407]).
The standard for this conduct is similar to that for common-law dissolution. The term "oppressive" is not defined in the statute. Courts have interpreted the term "oppressive" in an open-ended manner, holding that a minority shareholder is subject to oppression when the majority or controlling parties' conduct defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture (see Matter of Kemp & Beatley [Gardstein], supra at 73; see also In the Matter of Charleston Square, Inc., 295 AD2d 425 [2d Dept. 2002]; In re Dissolution of Upstate Medical Associates, P.C., 292 AD2d 732 [3rd Dept. 2002). "Oppressive actions," is broader and the most common ground for relief under Section 1104-a. (see Bus. Corp. Law § 1104-a [a][1] [2011]). The touchstone for oppressive conduct is whether the actions of the majority substantially defeat the reasonable expectations that were central to the petitioning shareholder's decision to invest in the corporation. A court considering a petition alleging oppressive conduct must investigate what the majority shareholders knew, or should have known, to be the petitioner's expectations in entering the particular enterprise. Majority conduct should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled. Disappointment alone should not necessarily be equated with oppression. Rather, oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture (see Matter of Kemp, supra at 73]). Oppression may be found where the minority shareholder is excluded from the operation of the corporation (see Matter of Clever Innovations, Inc. [Dooley], 94 AD3d 1174, 1176 [3d Dept 2012]).
A finding of oppression also "may be based on the complaining shareholder's frustrated expectations in such matters as continued employment or a share in the profits and management of the corporation, such that [he or] she feels that the other shareholders have deprived [him or] her of a reasonable return on [his or] her investment" (Matter of Parveen, 259 AD2d 389, 391 [1st Dept. 1999]; see Matter of Williamson v Williamson, Picket, Gross, 259 AD2d 362 [1st Dept. 1999]; see also Matter of Digeser v Flach, 49 Misc 3d 1213[A], 2015 NY Slip Op 51609[U], *5-6 [Sup. Ct., Albany Co. 2015].)
However, a shareholder whose own acts result in the complained of oppression cannot seeks dissolution of the corporation, utilizing Business Corporation Law § 1104-a, on the basis of those very acts (see Matter of the Jud. Dissolution of Stony Cr. Indus. Inc., 6 Misc 3d 1019[A], 1019A, 2005 NY Slip Op 50122[U], *4-5 [Sup Ct, Nassau Co. 2005]; Matter of Pace Photographers, Ltd. [Rosen], 71 NY2d 737 [1988]; and Matter of Kemp & Beatley, Inc. [Gardstein], supra. This is exactly what Kissim is attempting to do. His removal from the [*12]premises was a direct result of his having stolen receipts from the corporation. However, his brother, Avraham, also under-reported receipts, and used corporate funds to pay for his defense of this action, for which he was held in contempt. Hence, there is fault on both parties, and the Court finds that dissolution under both common law and BCL §1104-a is a viable option to prevent further conduct of this kind.
In determining whether to proceed with involuntary dissolution, pursuant to this section, the Court shall take into account: (1) Whether liquidation of the corporation is the only feasible means whereby the petitioners may reasonably expect to obtain a fair return on their investment; and (2) Whether liquidation of the corporation is reasonably necessary for  the protection of the rights and interests of any substantial number of shareholders or of the petitioners (see Wolfsohn v Wolfsohn, 2011 NY Slip Op 33109[U], *7-8 [Sup. Ct., Nassau Co. 2011].) The appropriateness of an order of dissolution pursuant to BCL § 1104-a is within the sound discretion of the court considering that application (see Matter of Fancy Windows & Doors, 244 AD2d 484 [2d Dept.1997], citing Matter of Kemp & Beatley, Inc., supra).
Independent of BCL § 1118, a court granting common law dissolution has the equitable power to compel a buyout at fair value, similar to that permitted by BCL § 1118. In Cortes v 3A N. Park Ave Rest Corp., 46 Misc 3d 670, 2014 NY Misc. LEXIS 4693, 2014 NY Slip Op 24329 [Sup. Ct., Kings Co. 2014], the Court explained "[w]hether it is necessary to actually dissolve the corporation in order to redress petitioner's grievances is, however, a matter to be considered independently once grounds for dissolution have been established." The court in Cortes ruled that a buyout at fair value was the appropriate form of relief. This Court believes that the same relief would be optimal to the parties in the instant case.
The Cortes Case
The Cortes case (Cortes v 3A N. Park Ave Rest Corp, supra) involved a 150-table Mexican restaurant, in which the plaintiff, held a 16.67% stock interest in the restaurant's operating company, and the remaining shares were owned equally by defendants. Cortes filed a lawsuit asserting individual and derivative claims seeking money damages and imposition of a constructive trust for breach of fiduciary duty and for failure to declare dividends against the other two owners, and for common-law dissolution of the restaurant corporation or, alternatively, a compulsory buy-out of his shares for "fair value." The suit principally accused the defendants of looting millions of dollars in cash receipts from the restaurant operations, none of which was reported in the corporation's financial statements or tax returns which consistently showed little or no profit.
Following a non-jury trial before Justice Demarest, in Supreme Court, Kings County, Commercial Division, the court concluded that defendants shared the diverted cash and that each participated in the effort to cheat plaintiff out of his share of the return on his investment; provided false information to the accountant for inclusion in the corporation's tax returns and financial reports; and that defendants breached their fiduciary duty to plaintiff as a minority shareholder by diverting profits to themselves, without disclosure to plaintiff, depriving him of his right to share therein. The court directed entry of a money judgment against defendants and in favor of the corporation, in the sum of approximately $4.9 million, including prejudgment interest through June 2011, plus additional prejudgment interest at 9% from June 2011 to the date of entry (see [*13]http://www.nybusinessdivorce.com/2014/11/articles/accountantsexperts/restaurants-cash-skimming-majority-owners-compelled-to-buy-out-minority-shareholder-for-fair-value-or-face-dissolutio n/ [accessed July 17, 2017]). The court also gave the defendants the option of buying out the plaintiff at the valuation it found for the business, less a 10% marketability discount, or dissolving the corporation, and paying the plaintiff his 16.67% share of the proceeds.
In Cortes, there was a unilateral fiduciary breach by the defendants in diverting profits. However, in the case at bar, the Court finds that both parties have engaged in looting, waste, and diversion of corporate assets. The testimony demonstrated that Nissim diverted the gross receivables of the parking lot and flea-market business for his own use. Similarly, the record demonstrates that Avraham understated the amounts of gross receivables from the parking business and used corporate assets to pay for his defense in this matter. 
The Court recognizes that dissolution is a drastic step which should be taken as a last resort (see Cortes, supra). Here, the circumstances strongly suggest that liquidation of the corporation is the only feasible means whereby the petitioner's rights will be protected and he may reasonably expect to obtain a fair return on his investment. The dissolution of the real-estate holding company and the sale of its real-estate, drastic as it might be, appears to be the only way to permit the minority shareholder to effectuate his investment expectations. The real-estate market in Jamaica is at a peak at the present time due to an economic resurgence in the area. The brothers have demonstrated an inability to agree on the direction of the corporation, and an inability to make a steady, growing profit from the parking business. Avraham has taken an intractable and pedantic stance where his brother is involved, insisting that things be done his way or not at all, as evidenced by his refusal to consider offers to sell or lease the property. The Court finds it fairly certain that this business will continue on its present immutable course with the current ownership in place. Stagnation or maintenance of the status quo will ill-satisfy the expectations of the minority investor, and, if the majority investor wants to keep things as they are, he may do so by buying out his brother, making him sole owner of the properties. To continue to permit the status quo to exist, particularly given the upturn in the Jamaica economy and associated property values of the area, would serve neither of the litigants in this matter. Further opportunities might be lost, and these two individuals, whose basic philosophies of how to handle their business is vastly different, would accomplish nothing but continue their personal disagreements and battles. However, prior to ordering dissolution, the Court will permit the respondent to exercise the option to buy his brother's shares, so that he is the sole owner of the business.
Accordingly, absent an agreement by the parties to the contrary, Avraham shall have ninety (90) days from the entry of judgment in which to purchase Nissam's shares of Corner for $3,170,173. with no marketability discount. Absent an agreement by the parties to the contrary, Avraham shall have ninety (90) days from the entry of judgment in which to purchase Nissam's shares of Mall for $1,666,457.
Should Avraham decline to do so, then Corner shall be dissolved [FN2]
, and the proceeds [*14]distributed to each party in conformity with their interest as shareholders as was done in Cortes. In so doing, the petitioner is entitled to pre-judgment interest, from the date of May 7, 2013, at the statutory rate of nine (9) percent. The Court declines to award reasonable attorneys' fees in connection with the dissolution portion of the action, as a matter of equity, the Court having found neither party innocent of violating the strictures of BCL section 1104-a; and hence that neither side is a "prevailing party" in the dissolution action.
Derivative Action (Breach of Fiduciary Duty)
Derivative actions brought by minority shareholders vindicate the corporation's rights (see Bansbach v Zinn, 1 NY3d 1, 8 [2003].) On the one hand, derivative actions are not favored in the law because they ask courts to second-guess the business judgment of the individuals charged with managing the company. On the other hand, derivative actions serve the important purpose of protecting corporations and minority shareholders against officers and directors who, in discharging their official responsibilities, place other interests ahead of those of the corporation.
A fiduciary duty is a relationship of higher trust that arises out of an obligation to act for or give advice to another upon matters within the scope of the relation (see EBCI, Inc. v Goldman Sachs, 5 NY3d 11 [2005]). It is well established that corporate directors and officers have fiduciary duties to the corporation, including the duty of good faith, due care, and vigilance in the preservation and use of its property (Zelouf v Zelouf, 2013 NY Slip Op 33906[U], *6 [Sup. Ct., NY Co. 2013].)
Here, the Court has already determined that the evidence demonstrated a mutual breach of fiduciary duty owed to one another by each of the brothers/shareholders by using profits for personal purposes. The evidence indicates that the amount of misappropriated funds by the petitioner was incorporated in the $355,000 loan agreement, intended to pay the respondent back for his share of the shortfall. There was insufficient proof of the amount of shortfall caused by the respondent's under-reporting of the number of vehicles parked in the parking lot, and the proceeds of the flea market. Since the parties reached an agreement with respect to the $121,000 taken by the petitioner from gross receipts, that it would be paid through one of the two loans made to the petitioner and payable thereby directly to the respondent, the Court shall enforce the parties' agreement in this regard. Hence there are no cognizable damages owed to the corporation vis a vis the derivative claim.
Promissary Notes
Even if the subject promissary notes were part of one integrated transaction as the petitioner contends (see BWA Corp. v Alltrans Express U.S.A., Inc., 112 AD2d 850 [1st Dept. 1985]), the Court does not find that the resondent breached the distribution agreements by failing to make distributions. The company paid did not have net profits to distribute, and the premiums on the brothers' family health coverage were paid whether the company was profitable or not. Hence, the performance of the defendant in the notes action, Nissim Kassab, is not excused. Encompassed within the implied obligation of each promisor to exercise good faith is a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract (see Dalton v Educ. Testing Serv., 87 NY2d 384, 389 [1995]). Where the contract contemplates the exercise of discretion, this pledge [*15]includes a promise not to act arbitrarily or irrationally in exercising that discretion (Id). The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship (Id.) Avraham's decision to accelerate the notes and increase the interest rate may have been retaliatory in nature for the commencement of this lawsuit, or they may have been occasioned by a good-faith doubt as to the creditworthiness of his brother, Nissim, and a worry about his ability to repay the notes. The petitioner, Nissim, has not carried his burden of demonstrating at trial that it was the former, rather than the latter. Moreover, the clear terms of the pledge agreements which were ancillary to the notes permitted Avraham to change the terms of the agreement, and Nissim was represented by counsel, and had every opportunity to read and understand those terms. A party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms (see Shklovskiy v Khan, 273 AD2d 371, 372 [2nd Dept 2000]; see also Prompt Mtge. Providers of N. Am., LLC v Zarour, 148 AD3d 849 [2nd Dept 2017].)
Notwithstanding the foregoing, the Court finds this issue academic in light of the fact that the maturity dates of the notes have now passed, and since counsel to the plaintiff in this action, Avraham Kasab, (attorney Paykin) waived the excess interest on behalf of his client at a deposition in this matter. Moreover, at the inception of the trial, it was agreed that the enhanced interest rate would not be sought (see trial transcript pp. 8-10). . The testimony indicated that the amount of $75,000, representing the amount taken from gross receipts by the defendant, was incorporated in the $355,000 loan made to the defendant.
Accordingly, the Court finds no basis to decline to enforce the terms of the promissory notes entered into by the defendant, Nissim Kassab, in the notes matter for the principal amounts and at the interest rates of 4.35 and 0%, respectively, from the maturity dates. The Court further declines to deem the collateral, i.e., Nissim's shares in the corporation, forfeited under section 6.2 (III) of the pledge agreement, as that would cause an inequitable forfeiture of the defendant's shares, which he could otherwise redeem to pay off the debt. However, the plaintiff, Avraham Kasab, is the prevailing party in this action, and, as such, is entitled to fees and costs, along with reasonable attorneys' fees incurred in collecting under the promissory notes, which the Court finds should be assessed at $25,000.00. If this amount is insufficient, plaintiff shall submit an Affirmation of Attorneys' Fees directly attributable to the efforts to collect the notes.
Respondent's Counterclaims
The first counterclaim for breach of fiduciary duty is determined, as set forth earlier in this decision, to wit, that both parties have breached their reciprocal fiduciary duty to one another, with the corresponding consequences. As to the second counterclaim for prima facie tort, the elements of a cause of action for prima facie tort are: (1) intentional infliction of harm; (2) which results in special damages; (3) without any excuse or justification; and (4) by an act or series of acts which would otherwise be lawful. (See Golub v Esquire Publ., 124 AD2d 528, 529 [1st Dept. 1986]; Antonelli v Trans World Entertainment Corp., 2014 NY Slip Op 31127[U], *10-11 [Sup Ct, NY Co. 2014].]). The action complained of must have been "solely motivated by malice or 'disinterested malevolence," and the plaintiff must have "suffered specific, measurable loss, which requires an allegation of special damages." (Id.) Avraham has not submitted any evidence to support the conclusion that Nissim's sole motivation was malice. The evidence suggests that it was economic necessity. Hence, the Court dismisses the second [*16]counterclaim for prima facie tort. The third counterclaim for fraud is similarly dismissed. "A cause of action to recover damages for fraud requires allegations of (1) a false representation of fact; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages" (Greenberg v Blake, 117 AD3d 683 [2nd Dept. 2014] quoting Stein v Doukas, 98 AD3d 1024, 1025 [2d Dept. 20I2])." The requisite elements of fraud have not been demonstrated.
Conclusion
The Court is convinced, therefore, after conducting the trial, that the proper course of action is to permit Avraham, within ninety (90) days of the service of a copy of this Order with Notice of Entry, pursuant to BCL §1118(a), to purchase Nissim's shares in Corner, at their fair value, as determined in this Order. While dissolution was dismissed as a remedy in the case of Mall, this Court will permit the purchase of Nissim's shares in that entity should the parties desire for the purpose of complete closure, for the amount found by the valuation expert, $1,666,457. If that does not occur, then the Court orders a dissolution and sale of the assets of the Corner corporation at the valuation determined herein, $12,680,691, and a distribution of the proceeds in line with the 25/75% interests of the parties.
Accordingly, based upon the foregoing, it is
ORDERED, ADJUDGED AND DECREED that, absent an agreement by the parties to the contrary, the fair value of petitioner NISSIM KASSAB's shares, reflecting 25% ownership in CORNER 160 ASSOCIATES, INC., as of May 7, 2013, is $3,170,173; and it is further ADJUDGED that, absent a stipulation the fair value of petitioner's shares in MALL 92-30 ASSOCIATES, LTD., as of May 7, 2013, is $1,666,457; and it is further ADJUDGED that, petitioner is entitled to pre-judgment interest, from the date of May 7, 2013 at the statutory rate of 9% percent, until the date of payment; and it is further
ORDERED, ADJUDGED AND DECREED that, absent an agreement by the parties to the contrary, respondent AVRAHAM KASAB shall have ninety (90) days from the entry of judgment in which to purchase the shares of CORNER 160 ASSOCIATES, INC., and currently owned by petitioner NISSIM KASSAB, reflecting 25% ownership in CORNER 160 ASSOCIATES, INC; and it is further
ORDERED, that the plaintiff, AVRAHAM KASAB, shall have judgment against the defendant, NISSIM KASSAB, for the principal amounts due under the promissary notes, plus interest , in the amount of 4.35% and 0%, respectively, from the maturity dates, plus reasonable attorneys' fees in the sum of $25,000; and it is further
ORDERED, that any stays or injunctions in this matter are vacated and recalled; and it is further
ORDERED, that the signing of this decision - Bench Trial Order and Judgment and Declaration - shall not constitute entry or filing under CPLR Rule 2220. Counsel is not relieved from the applicable provisions of that Rule respecting filing, entry and Notice of Entry.
The parties shall retrieve their original trial exhibits from Courtroom 43, within twenty (20) days, otherwise, they will be discarded.
The foregoing constitutes the decision and Order and Judgment and Declaration of the Court.
Dated: August 3, 2017
TIMOTHY J. DUFFICY, J.S.C.



Footnotes

Footnote 1:The action, under Index No.711073/15, was originally commenced in Supreme Court, Nassau County. By Court Order, dated February 27, 2014 (J. Jaeger, Supreme Court, Nassau County), the Court ordered that the action pending in Nassau County, under Nassau County Index No. 10903/13, be transferred to Supreme Court, Queens County, to be joined with the prior action pending in Queens County, under Index No. 14428/13. The Queens County Clerk assigned 4811/15 as the new Queens County Index number. On October 26, 2015, the parties filed a Stipulation and Consent to E-filing. The Index number was changed again to (e-file) Index No. 711073/15. 

Also on October 26, 2015, the parties filed a Stipulation and Consent to E-filing for the action pending under Index No. 14428/13. The Index number was changed to (e-file) Index No. 711061/15. Because there was an error of the spelling of the proper last name of Avraham, his last name is referred to as Kassab in some of the prior proceedings and court orders, and then as Kasab through the trial and in this Order. On March 26, 2017, at the trial of these actions, under Index Nos. 711061/15 and 711073/15, defendant/respondent Avraham Kassab submitted an application to this Court to amend the caption to reflect the proper spelling of his name to read Avraham Kasab. On March 27, 2017, this Court signed a Short Form Order to amend the caption based upon the consent of the parties and the record of this Court.

Footnote 2:As per the Appellate Division decision, the Court has no power to dissolve Mall; however, the Court is giving respondent/respondent the option of purchasing Nissim's share in Mall, since its property comprises part of the parking lot, and would provide finality with respect to their dispute.